[No. 66966-4-I. Division One. July 25, 2011.]

THE STATE OF WASHINGTON, *Respondent*, v. SCOTT ELWOOD WEAVILLE, *Appellant*.

802

*John A. Hays*, for appellant.

*Anthony F. Golik, Prosecuting Attorney*, and *Michael C. Kinnie* and *Anne M. Cruser, Deputies*, for respondent.

¶1 Dwyer, C.J. — Penetration, an element of rape in the second degree, is not defined within chapter 9A.44 RCW. Nevertheless, mere contact between the sex organs of two individuals does not constitute penetration. A jury instruction defining "penetration" in this manner is erroneous. Here, the supplemental instruction given to the jury contained such an incorrect statement of the law. Accordingly, we reverse Scott Weaville's conviction of rape in the second degree. We affirm his remaining convictions.

## I

¶2 On August 12, 2009, Weaville and his roommate, Thomas Wilson, purchased three "mollies," which are a pill form of MDMA (3,4-Methylenedioxymethamphetamine), a drug commonly referred to as ecstasy. Weaville and Wilson ingested one pill each. That same evening, Weaville invited his friend, A.S., over to his apartment, indicating that he had a gift for her. A.S. did not arrive at Weaville's apartment until sometime after 2:30 a.m. on August 13. By that time, Weaville had been drinking for many hours and was quite intoxicated. At some point, A.S. ingested a pill offered by

Weaville.[1] Sometime thereafter, A.S. began to feel strange, with her body becoming numb, noises sounding louder, and lights appearing brighter. According to A.S., she became entirely unable to move.

¶3 Hours after A.S.'s arrival, Wilson left the living room to go to bed. Weaville then removed A.S.'s shorts and underwear and proceeded to rub her calves, moving his hand up to her inner thigh. Weaville thereupon stopped his advances and, instead, entered Wilson's room, awakened Wilson, and asked Wilson if he wanted to have sex with A.S. Wilson was reluctant. Yet Weaville insisted that Wilson should "get at it," suggested ways that Wilson could make it more appealing, and threatened Wilson that he could not remain Weaville's roommate if he did not do it. Report of Proceedings (RP) at 262. Weaville "kept tugging at [Wilson's] shorts and telling [him] to . . . get at it." RP at 261-62. Weaville gave Wilson a condom. Despite Wilson's claimed reluctance, he nevertheless then attempted to have sex with A.S. He put on the condom and masturbated in an attempt to obtain an erection. Wilson positioned himself behind A.S., but managed to get only "to the threshold . . . up against" A.S., where he could feel his "penis touching her vagina." RP at 265. Wilson "couldn't get hard" enough to enter her. RP at 264. Wilson then informed Weaville that he was going back to sleep, and he returned to his bedroom.

¶4 Weaville then picked A.S. up, carried her into his bedroom, and laid her on the bed. Weaville removed his clothes, put on a condom, and masturbated. Weaville claims that he was unable to obtain an erection and, as a result, did not penetrate A.S.'s vagina. On the other hand, A.S. recalls that Weaville penetrated her vagina with his penis.

¶5 Later, A.S. began to regain her ability to move. She stayed in Weaville's bed until she was sure that she would be able to walk, at which point she walked to the living room, dressed, managed to get out to the parking lot, and

---

[1] A.S. later testified that, at the time, she believed that Weaville was providing her with a Tylenol pill and that she was unaware that the pill that she ingested was MDMA.

telephoned a friend. A.S. then returned to her apartment, where she took a shower, changed her clothes, and went to sleep.

¶6 Later that same day, A.S. went to her mother's house, where she described her ordeal to her mother. Her mother called the police so that A.S. could file a police report. A.S. provided the police with the clothing that she believed she had been wearing at the time of the incident. The responding police officer encouraged A.S. to go to the hospital. At the hospital, A.S. was examined by a sexual assault nurse. A.S.'s urine tested positive for MDMA.

¶7 The State then charged Weaville by amended information with rape in the second degree, attempted rape in the second degree, and delivery of a controlled substance, alleging that Weaville engaged in sexual intercourse with A.S. when she "was incapable of consent by reason of being physically helpless or mentally incapacitated; contrary to [RCW] 9A.44.050(1)(b), and/or was an accomplice to said crime pursuant to RCW 9A.08[ ].020."[2] Clerk's Papers (CP) at 10.

¶8 During pretrial motions, the parties disputed the admission of certain evidence. Specifically, the defense wanted to admit the underwear that A.S. had provided to the police. Testing of the underwear revealed no semen from either Weaville or Wilson, but it did present a semen deposit from a man who had been incarcerated for several months. The trial court excluded the evidence.

¶9 The defense further desired to present evidence that Weaville and A.S. had engaged in consensual sex on one previous occasion a few months before the August 13 incident. As an offer of proof, Weaville submitted a declaration, which stated:

> I have known [A.S.] for several years and considered her a good friend prior to this alleged incident. On March 21, 2009 I

---

[2] The original information had charged both Weaville and Wilson. However, in exchange for his testimony against Weaville, Wilson pleaded guilty to assault in the second degree with sexual motivation.

returned home on leave from active duty in the U.S. Marines. [A.S.] picked me up from the airport and we went to stay at a motel on Chaklov Drive in Vancouver. We had consensual sexual intercourse that night.

CP at 26. The State argued that evidence of a prior sexual relationship was irrelevant because lack of consent was not an element of the crime as charged against Weaville. The defense argued that its evidence established both that A.S. was capable of consent on August 13 and that she actually consented that night; consequently, the defense argued, the evidence of Weaville's and A.S.'s prior sexual encounter was relevant to determining the reasonableness of Weaville's belief that A.S. consented on August 13. The trial court accepted the State's position and excluded the evidence:

> [M]y ruling is this: that sex months before, consensual sex, is irrelevant in light of the fact that lack of consent is not an element here. . . . So it would be like proving consent if she was 12 years old and it was a rape of a child charge. Consent is not an issue. You simply can't have sex with a person who's mentally or physically debilitated or incapacitated, whether they consent or not. That's my ruling.

RP at 16-17.

¶10 At trial, A.S. testified that her vagina had been penetrated by Wilson's penis on one occasion and by Weaville's penis on another occasion. This testimony was the first indication that Wilson's penis had penetrated her vagina, as she had previously told the sexual assault nurse that Wilson had been unable to "find the right place" and "could not penetrate her." RP at 194-95.

¶11 The sexual assault nurse testified that her examination of A.S. revealed two sets of small contusions on A.S.'s arms and a small contusion on A.S.'s inner thigh. The nurse also found tears in two areas of A.S.'s external genitalia, the posterior fourchette[3] and the fossa navicularis.[4] The nurse testified that such tears would likely heal within two or

---

[3] The "posterior fourchette" is "the bottom [very thin] membrane of the vagina [located] at the very bottom, closer to the anus than the urethra," where the "labia

three days and that A.S.'s tears had likely occurred only 10 to 12 hours earlier. The nurse then testified that the injuries she observed in A.S.'s vaginal area were consistent with physical force by an erect adult penis.

¶12 Wilson testified to the events of August 12 and 13, indicating that he had attempted to rape A.S. because of Weaville's encouragement. He testified that shortly before and during the time that he was attempting to have sex with A.S., she appeared to be passed out or asleep. However, Wilson testified that, after he had attempted to have sex with A.S., she got up from the couch and walked into the bathroom.

¶13 Weaville testified in his own defense.[5] He admitted to attempting to "hook up [A.S.] and Thomas together" and to providing Wilson with a condom. RP at 559-60. Weaville then testified that he and A.S. had attempted to have consensual sex but that he had been unable to obtain an erection. Weaville insisted that A.S. was talking and walking throughout the night. Specifically, he testified that while they were watching the movie, she put her legs across his lap and that while he was rubbing A.S.'s leg, they were both "making small talk." RP at 552. He further testified that she had raised her hips up off of the couch in order to help him remove her shorts and underwear. According to this testimony, when Weaville left the couch to get Wilson, he told A.S. that he would be back and she said, "[O]kay." RP at 554. Weaville also testified, consistent with Wilson's testimony, that after Wilson's encounter with A.S., she got up from the couch and walked to the bathroom. Indeed, according to Weaville, A.S. vocally consented to sexual inter-

_____

minora, which are the inside lips of the vagina, come together at the bottom." RP at 199.

[4] The "fossa navicularis" is a little pocket located "just inside the posterior fourchette," "within a quarter of an inch inside" the vagina. RP at 199.

[5] Evidence of cell phone text message conversations between Weaville and Wilson and between Weaville and A.S. was admitted at trial. Many of these text messages were incriminating; for example, Weaville texted A.S.: "I don't want to go to jail for the rest of my life" and "[p]lease don't press charges and ruin my life." RP at 439.

course with Weaville himself: he asked her if she wanted to go to bed with him and she responded affirmatively, whereupon she rose from the couch of her own accord and walked to the bedroom with him. He denied carrying her to the bedroom.

¶14 Once in the bedroom, Weaville testified, he had been unable to obtain an erection, despite his own attempt and A.S.'s attempt to "stimulate" him. RP at 567. According to Weaville, after "five or ten minutes of [them] trying to have this intimate moment," A.S. stated, "Wait, wait, wait, this is dumb." RP at 568. A.S. then left the room and left the apartment.

¶15 Prior to its deliberations, the jury was instructed, as to count 1:

> To convict the defendant of the crime of Rape in the Second Degree, as charged in Count 1, each of the following three elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That on or about August 13, 2009, the defendant engaged in sexual intercourse with A.E.S.
>
> (2) That the sexual intercourse occurred when A.E.S. was incapable of consent by reason of being physically helpless.
>
> (3) That this act occurred in the State of Washington.

CP at 37 (Instruction 8). The jury was further instructed that "[s]exual intercourse means that the sexual organ of the male entered and penetrated the sexual organ of the female and occurs upon any penetration, however slight." CP at 38 (Instruction 9).

¶16 As to count 2, the jury was instructed:

> To convict the defendant of the crime of attempted Rape in the Second Degree, as charged in Count 2, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That on or about August 13, 2009, the defendant acted as an accomplice to Thomas Wilson in an act that was a substantial step toward the commission of Rape in the Second Degree; as defined in instruction number 8.

(2) That the act was done with the intent to commit Rape in the Second Degree;

and

(3) That the act occurred in the State of Washington.

CP at 41 (Instruction 12).

¶17 After deliberations began, the jury inquired, "Regarding Instruction #9—is 'touching' considered 'slight penetration.'" CP at 53. The trial court drafted a supplemental instruction utilizing the definition of "sexual penetration" set forth in RCW 7.90.010(5), which provides definitions applicable to the Sexual Assault Protection Order Act, chapter 7.90 RCW. Over defense counsel's objection, the trial court provided the following supplemental jury instruction:

> "Penetration" means any contact, however slight, between the sex organ of one person and the sex organ of another person, or any intrusion, however slight, of any part of the body of one person into the sex organ of another person.

CP at 52 (Suppl. Instruction 1).

¶18 The jury found Weaville guilty of all charges.

¶19 He appeals.[6]

## II

¶20 Weaville contends that the trial court's supplemental instruction defining "penetration" was a misstatement of the law.[7] We agree.

¶21 Weaville was charged with rape in the second degree pursuant to RCW 9A.44.050(1)(b), which requires the State to prove that under circumstances not constituting rape in the first degree, the defendant engaged in sexual inter-

---

[6] Weaville does not contend that any of the alleged errors raised on appeal affected his conviction of delivery of a controlled substance. Accordingly, we not address that conviction further.

[7] We apply a de novo standard of review to such claims. *State v. Brett*, 126 Wn.2d 136, 171, 892 P.2d 29 (1995).

course with another person "[w]hen the victim is incapable of consent by reason of being physically helpless or mentally incapacitated." " 'Physically helpless' means a person who is unconscious or for any other reason is physically unable to communicate unwillingness to an act." RCW 9A.44.010(5). The statute further provides:

> "Sexual intercourse" (a) has its ordinary meaning and occurs upon any penetration, however slight, and
>
> (b) Also means any penetration of the vagina or anus however slight, by an object, when committed on one person by another, whether such persons are of the same or opposite sex, except when such penetration is accomplished for medically recognized treatment or diagnostic purposes, and
>
> (c) Also means any act of sexual contact between persons involving the sex organs of one person and the mouth or anus of another whether such persons are of the same or opposite sex.

RCW 9A.44.010(1).

¶22 Our courts have consistently held that any penetration of the female sex organ constitutes "sexual intercourse." *See, e.g., State v. Snyder*, 199 Wash. 298, 300-02, 91 P.2d 570 (1939) ("only the lips of her sexual organs had been penetrated"); *State v. Montgomery*, 95 Wn. App. 192, 201, 974 P.2d 904 (1999) ("[c]learly the labia minora are part of the statutory definition of vagina"). " '[I]t is not necessary that the penetration should be perfect, the slightest penetration of the body of the female by the sexual organ of the male being sufficient; nor need there be an entering of the vagina or rupturing of the hymen; the entering of the vulva or labia is sufficient.' " *Snyder*, 199 Wash. at 301 (quoting 52 C.J. *Rape* § 24, at 1015 (1931)). "[V]agina means all of the components of the female sexual organ and not just '[t]he passage leading from the opening of the vulva to the cervix of the uterus.' " *Montgomery*, 95 Wn. App. at 200 (second alteration in original) (quoting THE AMERICAN HERITAGE DICTIONARY 1970 (3d ed. 1992)).

■ ■ ¶23 However, sexual intercourse requires some "penetration." RCW 9A.44.010(1). "Penetration" is not de-

fined within chapter 9A.44 RCW. Without a statutory definition, " '[w]ords in statutes are to be understood in their ordinary and popular sense.' " *Montgomery*, 95 Wn. App. at 200 (alteration in original) (quoting *State v. Cain*, 28 Wn. App. 462, 464, 624 P.2d 732 (1981)). *Webster's New International Dictionary* defines "penetration" as "the act or process of penetrating," which is in turn defined as "having the power of entering, piercing, or pervading." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1670 (2002).[8] Similarly, "penetrate" is defined as "to pass into or through." WEBSTER'S, *supra*, at 1670.

¶24 In contrast, the trial court herein, utilizing a definition from a separate statute, defined "penetration," in part, as "any contact, however slight, between the sex organ of one person and the sex organ of another person." CP at 52 (Suppl. Instruction 1). The ordinary understanding of "contact" is "union or junction of body surfaces : a touching or meeting." WEBSTER'S, *supra*, at 490. Mere contact between the sex organs of the male and female does not constitute penetration. *Snyder*, 199 Wash. at 301 (" '[M]ere actual contact of the sexual organs is not sufficient.' " (quoting 52 C.J., *supra*, at 1015)). It is possible for the male sex organ to touch or meet the external areas of the female sex organ without actually entering or piercing the female sex organ. *See State v. Olsen*, 42 Wn.2d 733, 736, 258 P.2d 810 (1953) (discussing *State v. Bigger*, 34 Wn.2d 69, 208 P.2d 102 (1949)). In other words, touching can occur without penetration. Not all contact meets the statutory definition of "sexual intercourse."[9] Accordingly, the supplemental jury instruction given herein misstated the law.

---

[8] *Black's Law Dictionary* defines "penetration" as "[t]he entry of the penis or some other part of the body or a foreign object into the vagina or other bodily orifice." BLACK'S LAW DICTIONARY 1248 (9th ed. 2009).

[9] Instead, such contact may more accurately be characterized as "sexual contact," which is defined in chapter 9A.44 RCW and contained within the elements of the crime of indecent liberties, RCW 9A.44.100. " 'Sexual contact' means any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desire of either party or a third party." RCW 9A.44.010(2).

¶25 The trial court erroneously instructed the jury regarding the definition of "penetration." Instructional errors are presumed to be prejudicial. *State v. Rice*, 102 Wn.2d 120, 123, 683 P.2d 199 (1984). However, " 'an instruction that omits an element of the offense does not *necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.' " *State v. Brown*, 147 Wn.2d 330, 340, 58 P.3d 889 (2002) (quoting *Neder v. United States*, 527 U.S. 1, 9, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999)). Thus, a jury instruction that misstates an element of the crime is subject to harmless error analysis to determine whether the error has relieved the State of its burden to prove each element of the charged offense. *Brown*, 147 Wn.2d at 339. In order for an appellate court to hold that an erroneous jury instruction was harmless, the court must be convinced " 'beyond a reasonable doubt that the jury verdict would have been the same absent the error.' " *Brown*, 147 Wn.2d at 341 (quoting *Neder*, 527 U.S. at 19). "When applied to an element omitted from, or misstated in, a jury instruction, the error is harmless if that element is supported by uncontroverted evidence." *Brown*, 147 Wn.2d at 341.

¶26 Here, with respect to Weaville's conviction of rape in the second degree, it would be difficult to declare that the instructional error did not affect the verdict. There was evidence that A.S.'s posterior fourchette and fossa navicularis had been torn, consistent with penetration by a penis. However, conflicting evidence was presented regarding whether Weaville's penis had penetrated A.S.'s vagina. A.S. testified that Weaville had penetrated her vagina. Weaville, on the other hand, testified that he had not actually been able to maintain an erection that would allow him to penetrate her. Moreover, evidence was presented at trial that the combination of alcohol and MDMA would increase an individual's desire for sexual activity but would make it more difficult for that individual to successfully

engage in sexual activity.[10] Furthermore, because Wilson did not witness Weaville's sexual encounter with A.S., his testimony was unhelpful in determining whether Weaville had, in fact, penetrated A.S. Finally, A.S. testified that Wilson's penis had penetrated her vagina, a potential explanation for the cause of the genital tears observed.

¶27 The jury was entitled to disbelieve A.S.'s testimony that she had actually been penetrated by Weaville. *See State v. Thomas*, 150 Wn.2d 821, 874, 83 P.3d 970 (2004) ("Credibility determinations are for the trier of fact."). This principle is particularly notable here because A.S. had reported shortly after the event that Wilson had not penetrated her vagina but, at trial, had changed her account, testifying that Wilson had penetrated her vagina. Given the evidence and testimony presented at trial, we cannot say that the erroneous jury instruction was harmless as to Weaville's conviction of rape in the second degree.

¶28 In contrast, as to the conviction of attempted rape in the second degree, we are convinced beyond a reasonable doubt that the jury verdict would have been the same absent the erroneous supplemental instruction. To commit this attempt crime, the defendant must intend to have intercourse with a victim incapable of consent, *In re Pers. Restraint of Hubert*, 138 Wn. App. 924, 931-32, 158 P.3d 1282 (2007), but "engaging in sexual intercourse is not an essential element of the crime of *attempted* second degree rape." *State v. Gallegos*, 65 Wn. App. 230, 235, 828 P.2d 37 (1992). Rather, a person is guilty of attempting to commit rape in the second degree if the person intends to commit the crime and takes a substantial step towards its commission. *See* RCW 9A.28.020; *State v. Price*, 103 Wn. App. 845, 851 n.1, 14 P.3d 841 (2000). In order for conduct to comprise

---

[10] Defense expert witness, Dr. Robert Julien, testified that MDMA was a combination of a stimulant and a mild psychedelic compound, which allows a user to "have the energy from the amphetamine part to be stimulated and going and active all night." RP at 354. He explained that when the stimulant—MDMA—is combined with a depressant—alcohol—"[y]ou essentially end up with a stimulated . . . drunk." RP at 359. Dr. Julien then testified regarding the effects of alcohol: "It stimulates the desire, it inhibits the performance." RP at 360-61.

a substantial step, it must be strongly corroborative of the person's criminal purpose. *State v. Workman,* 90 Wn.2d 443, 452, 584 P.2d 382 (1978). Even a slight act done in furtherance of the crime constitutes an attempt where "the design of a person to commit a crime is clearly shown." *State v. Nicholson,* 77 Wn.2d 415, 420, 463 P.2d 633 (1969).

¶29 A substantial step toward penetration satisfies this element of attempted rape. The evidence presented at trial overwhelmingly indicated that Weaville encouraged Wilson to have sex with A.S. No evidence was presented from which it could be inferred that Wilson's intent was to only touch A.S. with his penis without penetrating her vagina. Neither was evidence presented from which it could be inferred that Weaville encouraged Wilson to only touch A.S. without penetrating her vagina. Rather, the evidence presented at trial establishes that Weaville both encouraged Wilson to have sexual intercourse with A.S. and threatened Wilson with repercussions if he did not do so. That Wilson may have been unable to penetrate A.S.'s vagina does not negate the essential element that a substantial step be taken to commit the rape. Wilson undoubtedly took a substantial step toward rape in the second degree when he donned a condom and kneeled between A.S.'s legs while she lay "passed out . . . or asleep," CP at 258, and Weaville undoubtedly was an accomplice to the attempted commission of that crime. In light of the evidence and the trial testimony, the error in the supplemental instruction was harmless beyond a reasonable doubt as to the conviction of attempted rape in the second degree.

¶30 Accordingly, we reverse Weaville's conviction of rape in the second degree due to the erroneous supplemental instruction. However, this error was harmless as to Weaville's conviction of attempted rape in the second degree, and that conviction stands.

III

¶31 Weaville also appeals from several evidentiary rulings made by the trial court. Weaville first contends that

the trial court erred by excluding evidence of a prior sexual encounter between Weaville and A.S. We agree, to the extent that the trial court deemed such evidence categorically excluded by the nature of the charges brought against Weaville.

¶32 A criminal defendant possesses constitutional rights both to present testimony in his or her defense and to confront and cross-examine witnesses. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *State v. Hudlow*, 99 Wn.2d 1, 14-15, 659 P.2d 514 (1983). However, only relevant evidence is admissible. ER 402. A criminal defendant has "no right, constitutional or otherwise, to have irrelevant evidence admitted" in his or her defense. *State v. Darden*, 145 Wn.2d 612, 624, 41 P.3d 1189 (2002).

¶33 Evidence is relevant if it tends "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. "To be relevant . . . evidence must (1) tend to prove or disprove the existence of a fact, and (2) that fact must be of consequence to the outcome of the case." *Davidson v. Mun. of Metro. Seattle*, 43 Wn. App. 569, 573, 719 P.2d 569 (1986). This definition includes "facts which offer direct or circumstantial evidence of any element of a claim or defense." *Davidson*, 43 Wn. App. at 573 (citing 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 83 (2d ed. 1982)). Specifically regarding the admissibility of evidence of prior sexual history:

> [I]f the evidence of prior sexual history of the complaining witnesses is not relevant under ER 401 standards, there is no problem under the Sixth Amendment or Const. art. 1, § 22. . . . As to evidence of high probative value, however, it appears no state interest can be compelling enough to preclude its introduction consistent with the Sixth Amendment and Const. art. 1, § 22.

*Hudlow*, 99 Wn.2d at 16. "The admissibility of past sexual behavior evidence is within the sound discretion of the trial court." *Hudlow*, 99 Wn.2d at 17.

¶34 Weaville was charged pursuant to RCW 9A.44-.050(1)(b), which requires that the State prove that Weaville engaged in sexual intercourse with A.S. at a time when she was "incapable of consent by reason of being physically helpless." Chapter 9A.44 RCW provides a statutory defense to this crime:

> In any prosecution under this chapter in which lack of consent is based solely upon the victim's mental incapacity or upon the victim's being physically helpless, it is a defense which the defendant must prove by a preponderance of the evidence that at the time of the offense the defendant reasonably believed that the victim was not mentally incapacitated and/or physically helpless.

RCW 9A.44.030(1). Consent itself provides an additional, common law defense:

> Though the rape statutes no longer expressly mention nonconsent as an element of rape, we believe consent remains a valid defense to a rape charge, for several reasons. First, nonconsent traditionally has been the essence of the crime of rape. Second, the concept of consent has been retained in the new rape statutes in the element of forcible compulsion, its conceptual opposite. Finally, the "continuing validity" of consent as a defense is implied by statutory provisions (1) describing crimes against victims who are "physically helpless" or "mentally incapacitated"; (2) defining rape as sexual intercourse with a victim who "did not consent"; and (3) permitting evidence of a victim's past sexual conduct only when probative of consent.

*State v. Camara*, 113 Wn.2d 631, 636-37, 781 P.2d 483 (1989) (footnote and citations omitted). Thus, "a victim's consent is indeed a defense under the general rape statutes, RCW 9A.44.040-.060." *State v. Heming*, 121 Wn. App. 609, 611, 90 P.3d 62 (2004).

¶35 Where evidence is material to the defendant's defense, it is "a denial of due process to exclude it." *State v. Austin*, 59 Wn. App. 186, 194, 796 P.2d 746 (1990) (citing *Taylor v. Illinois*, 484 U.S. 400, 406-09, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988)). However, even where the defen-

dant raises the defense of consent, evidence of the victim's prior sexual behavior may not always be admissible. *See* RCW 9A.44.020(2) ("when the perpetrator and the victim have engaged in sexual intercourse with each other in the past, and *when the past behavior is material to the issue of consent*, evidence concerning the past behavior between the perpetrator and the victim may be admissible" (emphasis added)). "The inquiry as to the relevancy of prior sexual behavior of the complaining witness must be whether, under ER 401, the woman's consent to sexual activity in the past, without more, makes it more probable or less probable that she consented to sexual activity on this occasion." *Hudlow*, 99 Wn.2d at 10. Thus, "[f]actual similarities between prior consensual sex acts and the questioned sex acts claimed by the defendant to be consensual would cause the evidence to meet the minimal relevancy test of ER 401." *Hudlow*, 99 Wn.2d at 11. The inquiry into the relevance of past sexual activity requires an all-encompassing examination, both of the past sexual activity and of the circumstances comprising the defendant's defense, such as a claim of consent. We may be noting the obvious when we emphasize that such an all-encompassing inquiry is incompatible with the trial court's position herein that evidence of prior sexual activity was categorically excluded by the nature of the charges brought against the defendant.

¶36 The position of the State and the trial court—that evidence of prior consensual sexual activity could *never* be relevant in a prosecution for rape in the second degree pursuant to RCW 9A.44.050(1)(b)—precluded further elaboration by Weaville of his alleged prior sexual encounter with A.S. Weaville's offer of proof is limited to bare facts; it does not provide much information that can be compared with his testimony describing the events of August 13. As such, we cannot say that the evidence of the prior sexual encounter between Weaville and A.S. should have been admitted. We do not hold that the fact that these two people had previously engaged in sexual intercourse necessarily makes it more probable or less probable that A.S. consented

to sexual activity on August 13. Rather, further comparison of the events alleged to have occurred both on the previous occasion and on August 13 would assist the trial court in determining whether such evidence of prior sexual activity is relevant to Weaville's defense of consent. However, there is not a categorical bar to the admission of such evidence.

¶37 Notwithstanding that the trial court erroneously accepted the State's position that there was a categorical bar to the admission of such evidence, this error does not affect Weaville's conviction of attempted rape in the second degree. This is because the evidence that Weaville desired to present is not relevant to the facts underlying that conviction. Weaville did not present any evidence that the prior sexual encounter between A.S. and himself involved a third party. Nor did Weaville present any evidence that A.S. and Wilson had previously engaged in sexual activity prior to August 13. There was no particularized factual showing demonstrating even the slightest similarity between the past consensual sexual activity between Weaville and A.S. and the August 13 sexual activity between Wilson and A.S. Without such a showing, the proffered evidence lacks "the necessary predictive value required by ER 401." *Hudlow*, 99 Wn.2d at 11. Accordingly, the trial court's mistaken view that such evidence is categorically excluded did not affect Weaville's conviction of attempted rape in the second degree. Weaville himself testified that he had encouraged Wilson to have sexual intercourse with A.S. The trial court's decision to exclude the evidence of a prior sexual encounter between *Weaville* and A.S. did not deprive Weaville of his ability to testify to his version of the incident between *Wilson* and A.S. *See Hudlow*, 99 Wn.2d at 18.

## IV

¶38 Weaville next contends that the trial court erred by excluding evidence that A.S.'s underwear contained the semen of a person other than Weaville or Wilson. We disagree.

■ ¶39 As explained above, only relevant evidence is admissible. ER 402. Weaville desired to introduce evidence that A.S. had provided to the police underwear that contained the semen of a person other than Weaville or Wilson. The defense was not offering this evidence to demonstrate that someone other than Weaville or Wilson had sexual intercourse with A.S. on August 13. In fact, there was indisputable evidence that the other man could not have had sexual intercourse with A.S. on August 13. Nor was the defense attempting to offer the evidence for purposes of showing that A.S. was promiscuous. *See* RCW 9A.44.020.

¶40 Rather, Weaville contends that the evidence indicates that A.S. had "knowingly attempted to present false evidence." Appellant's Br. at 28. Weaville argues that A.S. provided the police with underwear containing semen—knowing that it did not contain semen of either Weaville or Wilson—in order to bolster her claims of rape. However, the proffered evidence indicated no such thing. Significantly, all parties testified that Weaville and Wilson wore condoms during the sexual encounters on August 13. That their semen did not appear on A.S.'s underwear is unsurprising. Moreover, the defense was unable to demonstrate that on August 13, A.S. had not been wearing the underwear that she provided to the police officers. There was no evidence that she "attempted to present false evidence."

¶41 Evidence that A.S.'s underwear contained the semen of a person other than Weaville or Wilson was not relevant. The trial court properly excluded the evidence.

V

¶42 Weaville finally contends that he received ineffective assistance of counsel because his attorney did not challenge the qualification of Christine Mitchell, the State's expert witness, to testify regarding the effects of MDMA. We disagree.

■ ¶43 To establish ineffective assistance of counsel, a defendant must show both (1) that counsel's performance

was deficient and (2) that the deficient performance resulted in prejudice to the defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).[11] Deficient performance is that which falls below an objective standard of reasonableness. *In re Det. of Moore,* 167 Wn.2d 113, 122, 216 P.3d 1015 (2009) (citing *State v. Stenson,* 132 Wn.2d 668, 705-06, 940 P.2d 1239 (1997)). Prejudice occurs where there is a reasonable probability that, but for the deficient performance, the outcome of the proceedings would have been different. *State v. McFarland,* 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

¶44 There is a strong presumption that counsel provided effective assistance and "made all significant decisions in the exercise of reasonably professional judgment." *State v. Lord,* 117 Wn.2d 829, 883, 822 P.2d 177 (1991). This presumption can be rebutted if the defendant proves that his attorney's representation " 'was unreasonable under prevailing professional norms.' " *In re Pers. Restraint of Davis,* 152 Wn.2d 647, 673, 101 P.3d 1 (2004) (quoting *Kimmelman v. Morrison,* 477 U.S. 365, 384, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986)). The reasonableness of counsel's performance is to be evaluated in light of all the circumstances. *Davis,* 152 Wn.2d at 673. Where defense counsel's conduct can be characterized as a legitimate trial strategy or tactic, it does not constitute deficient performance. *State v. Garrett,* 124 Wn.2d 504, 520, 881 P.2d 185 (1994). Generally, "[c]ounsel's decisions regarding whether and when to object fall firmly within the category of strategic or tactical decisions." *State v. Johnston,* 143 Wn. App. 1, 19, 177 P.3d 1127 (2007).

¶45 "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or

[11] It is unnecessary for us to address both prongs of the *Strickland* test where the defendant makes an inadequate showing as to either prong. *State v. Standifer,* 48 Wn. App. 121, 126, 737 P.2d 1308 (1987) (citing *Strickland,* 466 U.S. at 697).

otherwise." ER 702. "Practical experience is sufficient to qualify a witness as an expert." *State v. Ortiz*, 119 Wn.2d 294, 310, 831 P.2d 1060 (1992). However, "the expert testimony of an otherwise qualified witness is not admissible if the issue at hand lies outside the witness' area of expertise." *State v. Farr-Lenzini*, 93 Wn. App. 453, 461, 970 P.2d 313 (1999) (citing *Queen City Farms, Inc. v. Cent. Nat'l Ins. Co. of Omaha*, 126 Wn.2d 50, 103-04, 882 P.2d 703, 891 P.2d 718 (1994)). The trial court's admission or rejection of expert testimony is reviewed for an abuse of discretion. *Stenson*, 132 Wn.2d at 701.

¶46 The record reveals that Christine Mitchell testified as an expert pursuant to ER 702. Mitchell is a forensic toxicologist with the Washington State Patrol. She primarily tests "blood, urine, and other biological specimens for the presence of drugs and alcohol." RP at 320-21. She has a bachelor's degree in chemistry and a master's degree in forensic science. She testified that she was "educated in the effects of alcohol and drugs on human performance and on the human body." RP at 321. She indicated that her job required her to study the effects of drugs on individuals. Mitchell then testified that she was familiar with the effects of MDMA on individuals and that she became familiar with the effects of MDMA both through literature review and through "in-house training and out-of-house trainings." RP at 329. At trial, Mitchell described the effects of MDMA in detail and, for much of her testimony, she disclosed the details of various professional articles that she had reviewed.

¶47 Based on her experience, training, and job responsibilities, Mitchell was qualified to render opinions on the effects of drugs on humans. Mitchell's degrees in chemistry and forensic science, rather than specifically in "human physiology," did not render her unqualified to testify as she did. Although Mitchell did not have a degree in pharmacology, unlike the expert witness for the defense, that fact goes to the weight of Mitchell's testimony rather than to her

qualifications to give such testimony.[12] *See State v. Flett*, 40 Wn. App. 277, 285, 699 P.2d 774 (1985) ("once basic requisite qualifications are established, any deficiencies in an expert's qualifications go to weight, rather than admissibility of testimony").

¶48 Mitchell was qualified to testify regarding the effects of MDMA. Any objection to her qualifications would have been futile. "[U]nder prevailing professional norms," this representation was not deficient. *Davis*, 152 Wn.2d at 673.

¶49 We reverse Weaville's conviction of rape in the second degree.[13] However, we affirm Weaville's remaining convictions of attempted rape in the second degree and of delivery of a controlled substance.

BECKER and LEACH, JJ., concur.

Review denied at 173 Wn.2d 1004 (2011).

---

[12] The defense indicates that the most prejudicial testimony was Mitchell's testimony regarding the contents of an article that reports that one person experienced catatonic stupor after MDMA use. However, the defense expert gave similar testimony.

[13] The State suggested at oral argument that rather than ordering a new trial on the charge of rape in the second degree, we could simply order entry of judgment on attempted rape in the second degree, given the evidence. We need not decide whether this remedy would be appropriate in the context of this jury trial case, considering that this argument was not made in the briefing. We decline to grant such a remedy.