# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>                Respondent,<br><br>        v.<br><br>ALEXANDER M. EMERSON,<br><br>                Appellant. | DIVISION ONE<br><br>No. 84576-4-I<br><br>UNPUBLISHED OPINION |

DWYER, J. — Alexander Emerson appeals from the judgment entered on a jury's verdict convicting him of one count of rape in the second degree. On appeal, Emerson asserts that his trial counsel did not render effective assistance because, in pursuing a theory of general denial, his counsel did not additionally argue an affirmative defense that he had a reasonable belief that the alleged victim was not incapable of consenting due to physical helplessness. We conclude that defense counsel's strategy can be objectively viewed as a conceivable and reasonable trial tactic and that, even if such strategy was shown to be deficient, which we do not hold, no prejudice is shown to have resulted to Emerson from the employment of this strategy. Accordingly, we affirm.

I

The State charged Emerson with one count of rape in the second degree, alleging that he had engaged "in sexual intercourse with another person named L.B.,[1] under circumstances where L.B. was incapable of consenting to sexual intercourse by reason of being physically helpless."[2]  Emerson denied the charge.  A jury trial ensued.

The State, in its opening statement, told the jury that Emerson had thrust his penis into L.B.'s vagina while she was sleeping and that the forthcoming testimony of several witnesses (including L.B., other witnesses who she told about the incident, and several police officers) and certain text messages would prove that such conduct had occurred.  Defense counsel stated that the alleged rape did not occur and that the evidence presented at trial would instead create a reasonable doubt as to the occurrence of such conduct.

The following testimony and exhibits were presented to the jury during the parties' cases in chief.

In March 2019, L.B. was introduced to Emerson by her mother because he was a mutual acquaintance of L.B.'s mother, he was moving to Seattle, and L.B. was already living there at the time.

Between March and May 2019, L.B. and Emerson met in person on at least three different occasions.  L.B. testified that, during that time, she did not have any romantic feelings for Emerson, she did not believe her relationship with

---

[1] We use the initials L.B. to refer to the alleged adult victim in this matter.
[2] RCW 9A.44.050(1)(b).

2

Emerson was flirtatious, and she repeatedly told him that she was not interested in an intimate or exclusive relationship with him. Emerson testified that, during that time, he and L.B. were just friends but they had flirted with each other, and that, if L.B. wanted a sexual relationship with him, he would have reciprocated.

In late March 2019, L.B. and Emerson met in person for the first time at a bar near where L.B. lived at the time. They sat together for drinks and chatted and, later on, L.B. invited Emerson to her apartment to look at her living space as well as some art that she had created. While in that apartment, they had talked about possible career paths, including Emerson's work as a massage therapist and L.B.'s interest in such a career. They then demonstrated massage techniques on one another, on the floor of her bedroom and on her bed.

Emerson testified that, on that night, he stayed overnight and that L.B. had insisted that he sleep in her bed with her. He testified that L.B. told him "that it was okay for me to sleep with her in the bed, that we'd have boundaries," that he would sleep on one side of the bed while she slept on the other side, and that she made a divider on the bed with a blanket and pillows. He also testified that, during the night, he got up to use the bathroom and that, when he returned to the bed, the barrier was gone, and, after he laid down, L.B. grabbed his arm and put it around her body so that they were "cuddling."

L.B. testified that she recalled that Emerson had stayed overnight at that apartment but did not recall whether it was on the first night they met in person. She nevertheless testified that, when he first stayed overnight, they had been "hanging out" late into the evening, and she invited him to sleep over so that he

3

did not have to walk home alone late at night. L.B. testified that she invited him to sleep in her bed with him, she asked that they both stay on their own sides of the bed, they went to sleep in her bed, and no sexual conduct occurred between them.

Shortly thereafter, L.B. moved into a two-bedroom apartment with a friend of hers.

In early May 2019, L.B. invited Emerson to see her new apartment and, while there, he met her roommate. Emerson testified that L.B. invited him to stay over that night and sleep in her bed with her and they fell asleep "just cuddling like [they] did the first time" in the "spooning" position. For her part, L.B. testified that, on that occasion, Emerson did not spend the night.[3]

On May 4, 2019, L.B. and Emerson again met in person at L.B.'s new apartment. They drank alcohol and ate pizza while L.B. was painting a mural on her bedroom wall. L.B.'s roommate later joined them. L.B. testified that, during that evening, she saw Emerson and her roommate chatting, "almost cuddling a little bit" with each other while she was painting. Emerson testified that, while L.B. was painting, he and L.B.'s roommate "made out a little," and when L.B.'s roommate went to bed, he "gave her a hug" and "a kiss on the side of her neck," and that he did not recall her recoiling from him.

L.B.'s former roommate testified that, on that night, she came home late and saw L.B. and Emerson hanging out in the apartment. She testified that she

---

[3] L.B.'s roommate testified that she did not know whether Emerson stayed overnight on that occasion.

4

noticed that L.B. had "noticeable signs that she had drinken [sic] more than she usually would," and that Emerson was "pretty intoxicated," made "belligerent" comments about women, and kept on touching his body against hers while L.B. was painting. She testified that her impression was that Emerson had touched her with a sexual intention. She further testified that, when she stated that she was going to bed, Emerson hugged her, she hugged him back, and then he "kind of latched on to my neck and started kissing my neck," and she shoved him away. She testified that she then went to bed and fell asleep.

L.B. testified that, after her roommate went to bed, she and Emerson "hung out and talked for a while" and then she told him

> I'm going to go to bed. Uh, you can stay if you want, uhm, because, you know, I trusted him and, like, we were able to platonically sleep in a bed, and I had reiterated to him that, like, you know, these are my boundaries. And then, uhm, we went to bed.

Emerson testified that, after L.B.'s roommate went to bed, L.B. invited him to sleep in her bed, he told her he wanted to sleep on the couch, and she insisted that he sleep in her bed with her. He testified that he was wearing a shirt and boxers, and they both testified that L.B. was wearing a shirt and sweatpants.

Prior to falling asleep, they were in a "cuddle" position and were "spooning." L.B. testified that they "maybe cuddle[d] a little bit," and that she told him, "I'm not interested in you like that," but it was "normal for me to, like, cuddle friends" because she had friends in college that she could trust "with your boundaries after you express them." L.B. also testified that, prior to falling asleep in the "spooning" position, Emerson's right arm was on her hip, and she felt

5

comfortable in that position.  She testified that she fell asleep pretty much right away.

Emerson testified that, prior to falling asleep, he and L.B. chatted about body piercings, considered watching a movie, but then went to sleep.  Emerson testified that, when they fell asleep, they were still cuddling, she was laying on his arm, and he had his left arm over her.

L.B. testified that the next thing she remembered was awakening to the feeling of someone on top of her and that she saw that

> Emerson was on top of me, and my, uh, sweatpants were down. And, uhm, sorry to get graphic, but, uhm, uh, there was penetration. His—but, you know, when you're not aroused, it's kind of like—it's in, but it's having a hard time getting fully in.  So, it was erect, but not, like, super-duper hard, I think.  It was just mostly me being dry. Uhm, and there was thrusting movement.  And I froze for a second. Then I shoved him off immediately.  And then he, like, took my shoulder, pressed me back down, and tried to, like, pull at my pants again, and then, uh—and then, uh, I shoved  him off again.  And I yelled at him, like, what the fuck are you doing?  And, uhm, he kind of just [inaudible] to himself because I made him get off the bed. Uhm, I'm pretty sure he stumbled a little bit, and then, like, I kind of just said—I just, like, yelled at him briefly.

She testified that it was still dark outside and that she was not sure how long she had been asleep before she woke up.

Emerson, testified that, after falling asleep, he remembered

> waking up not too long after.  Uh, I felt as if she was kind of, uh, moving her pelvic area against mine.  Uhm, basically trying to get me aroused, but I was—I was unable to.  Uhm, I assumed something, uh, was going on.  Uh, then I kissed—I was just, uh, kissing her neck. . . .  Uh, she was moaning.  Uhm, she was on my right arm.  So, my left arm was on her—her hip, or her waist.  Uh, I began to undress her.  The—the sweatpants went down to about, like, mid-buttocks, or upper—upper thigh. We'd say [sic], that— that's where that would be.  She then yelled, "No. Stop."  Uhm, I

6

then backed away from her. She was, like, what do you think you're doing? What—why do you think you can be inside of me? Uh, I told her, no, I—I wasn't inside of you. Uhm, I'm not understanding, like, what—what's going on. . . . And she said, you need to get the fuck out of my house. Uh, you need to go right now. Uhm, I got up—I was laying by the window side, so I had to get—I had to go over her, or around her, uhm, to the foot of the bed. Uhm, I told her, I—I need to find my things. Can we talk about this? Like, what's—like, what—why are—why are you so upset? Like, I thought it was a mutual thing. Uhm, based on how we woke up.

They both testified that L.B. went immediately into her roommate's bedroom.

L.B.'s former roommate testified that she was awakened that night by L.B. entering her bedroom and that she saw that L.B. was shaking and crying, that her eyes were watering, and that L.B. told her that "she had fallen asleep, woken up, and [Emerson]—when she woke up, [Emerson] was on top of her and inside of her." L.B. testified that, when she woke up her roommate, she told her what happened while crying, panicking, and hyperventilating. Both L.B. and her roommate asked Emerson to leave. He did.

A series of text messages, time-stamped around 4:00 a.m. on May 5, 2019, admitted as an exhibit at trial, reads as follows:

> EMERSON: I got beat up and robbed. It was probably for the best. I really don't know what happened between us. Please enjoy your life. Thanks for being a friend.
> L.B.: You're a fucking disgusting being. Never contact me again. I hope you never put another person through what you put me through. Blocked.
> EMERSON: I am and I apologize. I should stop drinking all together. Never meant any harm.

Regarding that text message, Emerson testified he did not, in actuality, get "beat up and robbed," and that he had said as much because he "needed to get her to talk to me. Uhm, she's the only person that I knew. I had no one else to

talk to." He testified that he thought that "maybe she'd feel sorry and actually communicate with me."

After Emerson left the apartment, L.B.'s roommate testified, she tried to comfort L.B. and "erase as much of the interaction as possible," washing L.B.'s bedding and clothes, including the sweatpants that she was wearing. L.B. testified that she had called her mother several times but that her mother did not answer the telephone.

L.B.'s mother testified that, by the time she had located her telephone on the morning in question, she saw that she had missed several calls from her daughter. L.B. testified that she successfully spoke to her mother that morning. Her mother testified that L.B. sounded very upset and was crying. She recommended that L.B. call 911, which L.B. did.

Shortly thereafter, L.B.'s mother testified, she sent a text message to Emerson. An exhibit of that text message exchange admitted at trial read as follows:

> [L.B.'S MOTHER:] You raped my daughter? . . .
> [EMERSON:] No, no, that's not how it went down. I'm so sorry. I been sleeping over a couple nights, and last night we were drinking a lot. I'm not sure what fully happened. . . . She said to stop, and we were doing what we were doing, and I did. She told me I needed to leave, and I did. We did not have sex.

Later that morning, two police officers interviewed L.B. and her roommate. One officer testified that, in interviewing L.B., she appeared agitated, she perhaps had been crying, and she was upset. The other officer testified that he had collected the sweatpants that L.B. said that she was wearing that night. A

8

forensic scientist testified that she tested and examined L.B.'s sweatpants, that the results were negative, and that she concluded that there was no indication of semen or saliva on the sweatpants.

After the officers submitted their report, a police detective began to investigate L.B.'s allegations. He interviewed L.B. in person for about 90 minutes, collected text message conversations, spoke to L.B.'s roommate and her mother, and also spoke with Emerson over the telephone for one hour.

During his interview with the detective, Emerson testified, he said that he was sexually interested in L.B. Emerson also testified that he had lied to the detective about getting beaten up and robbed and that he had provided the detective with a fictional location, assault, and list of stolen items, as well as a fictional description of the perpetrator's height, skin color, hair color and style, and body shape. In response to the following question posed by the State, "You don't think that you gave [the detective] a detailed description of a completely false allegation over the course of this interview?", Emerson responded, "Over the course of time with thoughts in between, I—I did, yes."

After both parties had rested, the court read the following instructions, in pertinent part, to the jury:

### COURT'S INSTRUCTION NO. 3

The defendant has entered a plea of not guilty. That plea puts in issue every element of each crime charged. The State is the plaintiff and has the burden of proving each element of the crime beyond a reasonable doubt. The defendant has no burden of proving that a reasonable doubt exists as to these elements.

9

A defendant is presumed innocent. This presumption continues throughout the entire trial unless during your deliberations you find it has been overcome by the evidence beyond a reasonable doubt.

A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence or lack of evidence. If, from such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt.

. . . .

## COURT'S INSTRUCTION NO. 6

A person commits the crime of Rape in the Second Degree when he or she engages in sexual intercourse with another person when the other person is incapable of consent by reason of being physically helpless.

## COURT'S INSTRUCTION NO. 7

To convict the Defendant of the crime of Rape in the Second Degree, each of the following three elements of the crime must be proved beyond a reasonable doubt:

>    (1) That between May 4, 2019 and May 5, 2019, the defendant Alexander Emerson engaged in sexual intercourse with [L.B.];
>
>    (2) That the sexual intercourse occurred when [L.B.] was incapable of consent by reason of being physically helpless; and
>
>    (3) That this act occurred in the State of Washington.

If you find from the evidence that elements (1), (2), and (3) have been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.

On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

10

## COURT'S INSTRUCTION NO. 8

"Sexual intercourse" means that the sexual organ of the male entered and penetrated the sexual organ of the female and occurs upon any penetration, however slight or any penetration of the vagina or anus however slight, by an object, including a body part, when committed on one person by another, whether such persons are of the same or opposite sex.

## COURT'S INSTRUCTION NO. 9

"Consent" means that at the time of the act of sexual intercourse there are actual words or conduct indicating freely given agreement to have sexual intercourse.

## COURT'S INSTRUCTION NO. 10

A person is physically helpless when the person is unconscious or for any other reason is physically unable to communicate unwillingness to an act.

In closing argument, the State urged the jury to find Emerson guilty of rape in the second degree. The State argued that each of the elements of the charged crime were met because the evidence demonstrated that, on the night in question, Emerson had thrust his penis into L.B.'s vagina while she was sleeping. The State argued that L.B. was a credible witness because she had no motivation to fabricate a rape allegation, she was not biased against Emerson, and she had been consistent in her recounting of the events on the night in question. The State also argued that Emerson was not a credible witness because he had lied to not only L.B. but also a police detective about being robbed and assaulted in the early morning after the alleged incident.

Defense counsel argued in closing that the State had failed to meet its burden of proof as to two out of the three elements of the rape charge. Defense counsel first argued that the jury should find that a reasonable doubt existed as

to whether the State had established that Emerson's penis had penetrated L.B.'s vagina. Such a doubt existed, according to defense counsel, because inconsistencies in L.B.'s testimony reflected that she had made up the notion that she had been penetrated, while Emerson testified that such penetration did not happen and testing done on the sweatpants in question revealed no DNA, body fluid, or other evidence connected to Emerson. Defense counsel also argued that a reasonable doubt existed as to whether L.B. was physically incapable of consenting on the basis of her being asleep because the State's primary evidence in support of such incapacity was L.B.'s testimony but, according to defense counsel, L.B. had actually fictionalized the occurrence of the rape because she wanted the attention of others, including her roommate at the time.

The jury returned a verdict convicting Emerson as charged.

Emerson now appeals.

II

Emerson asserts that his trial counsel's performance was deficient because his attorney did not argue both a general denial defense and the "reasonable belief" statutory affirmative defense to rape in the second degree. Emerson also asserts that such purportedly deficient performance prejudiced him. As to both assertions, Emerson's claim fails.

In order to succeed on an ineffective assistance of counsel claim, a defendant must show that (1) the defense attorney's performance was deficient and (2) the defendant was prejudiced by that deficient performance. In re Det. of Hatfield, 191 Wn. App. 378, 401, 362 P.3d 997 (2015) (quoting State v.

Borsheim, 140 Wn. App. 357, 376, 165 P.3d 417 (2007)).  "Deficient performance is that which falls below an objective standard of reasonableness."  State v. Weaville, 162 Wn. App. 801, 823, 256 P.3d 426 (2011).  We presume adequate representation when there is any "'conceivable legitimate tactic'" that explains counsel's performance.  Hatfield, 191 Wn. App. at 402 (quoting State v. Reichenbach, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)).  "Prejudice occurs where there is a reasonable probability that, but for the deficient performance, the outcome of the proceedings would have been different."  Weaville, 162 Wn. App. at 823 (citing State v. McFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995)).  "Competency of counsel is determined based upon the entire record below."  McFarland, 127 Wn.2d at 335 (citing State v. White, 81 Wn.2d 223, 225, 500 P.2d 1242 (1972)).

Here, Emerson asserts that, based on the evidence presented at trial, his counsel's decision to not also argue the "reasonable belief" statutory affirmative defense was both deficient and prejudicial.

The "reasonable belief" statutory affirmative defense reads as follows:

> In any prosecution under this chapter in which lack of consent is based solely upon the victim's mental incapacity or upon the victim's being physically helpless, it is a defense which the defendant must prove by a preponderance of the evidence that at the time of the offense the defendant reasonably believed that the victim was not mentally incapacitated and/or physically helpless.

RCW 9A.44.030(1).[4]  However, prior to a jury considering such an affirmative defense, "[t]he jury would have had to find that the State had met its burden and

---

[4] The Washington Pattern Jury Instructions for the "reasonable belief" affirmative defense reads as follows:

13

proved every element of the rape charge beyond a reasonable doubt." State v. Powell, 150 Wn. App. 139, 157 n.12, 206 P.3d 703 (2009). This is so because that affirmative defense does not negate an element of the crime of rape in the second degree but, rather, only excuses the underlying conduct. See RCW 9A.44.030(1), .050(1)(b); State v. Riker, 123 Wn.2d 351, 368, 869 P.2d 43 (1994) (citing State v. Rice, 102 Wn.2d 120, 124-26, 683 P.2d 199 (1984); State v. Box, 109 Wn.2d 320, 323-30, 745 P.2d 23 (1987)). Furthermore, it is a well-established presumption that the jury follows both the law and the court's instructions. State v. Ervin, 158 Wn.2d 746, 756, 147 P.3d 567 (2006) (citing State v. Stein, 144 Wn.2d 236, 247, 27 P.3d 184 (2001)). Indeed, in a case involving a claim of ineffective assistance of counsel,

> [i]n making the determination whether the specified errors resulted in the required prejudice, a court should presume . . . that the judge or jury acted according to law. An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, "nullification," and the like. A defendant has no entitlement to the luck of a lawless decisionmaker, even if a lawless decision cannot be reviewed. The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision.

---

It is a defense to a charge of [rape in the second degree] [indecent liberties] that at the time of the acts the defendant reasonably believed that (name of person) was not [mentally defective] [or] [mentally incapacitated] [or] [physically helpless].

The defendant has the burden of proving this defense by a preponderance of the evidence. Preponderance of the evidence means that you must be persuaded, considering all the evidence in the case, that it is more probably true than not true. If you find that the defendant has established this defense, it will be your duty to return a verdict of not guilty [as to this charge].
11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 19.03 (5th ed. 2021).

Strickland v. Washington, 466 U.S. 668, 694-95, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

A

Emerson asserts that his conviction must be reversed. In so doing, he relies considerably on our decision in In re Personal Restraint of Hubert, 138 Wn. App. 924, 158 P.3d 1282 (2007), and the decision of Division II of this court in State v. Powell, 150 Wn. App. 139, both of which reversed the criminal convictions appealed therein on the basis that, because the evidence presented at those trials might have supported a defense theory predicated on the "reasonable belief" affirmative defense and the trial counsel therein did not pursue such a theory, the trial counsel therein rendered ineffective assistance. 150 Wn. App. at 154-58; 138 Wn. App. at 929-32.

In so relying on those decisions, Emerson argues that, because a litigation action was deemed necessary in one case, it is necessary in all cases. But this has always been wrong.

In Strickland itself, Justice O'Connor, writing for the Court majority, detailed the necessity of judicial deference to attorney tactics and strategy, the imperativeness of utilizing an objective standard, and the mandate of the presumption of competent performance. 466 U.S. at 687-91. Several of the Justice's many trenchant observations are particularly important herein.

> No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of

counsel and restrict the wide latitude counsel must have in making tactical decisions. . . .

. . . There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

Strickland, 466 U.S. at 688-89.

Courts are part of the government. The Sixth Amendment does not allow the government to control the presentation of a criminal defense. Rather, the defendant is guaranteed an independent counsel—one free from government control. Therefore, courts, in evaluating the claims advanced to them, must honor this constitutionally guaranteed independence in announcing their rulings.

Here, Emerson's defense was denial: he steadfastly denied that his penis penetrated L.B.'s vagina. He also testified that L.B.'s movements and the sounds she made were indicative of both her consent to his touching and her capacity to do so.

L.B. testified differently. She asserted that penetration did occur. She further testified that she was incapable of consent at that time.

Emerson's defense was centered on one goal: creating a doubt as to the State's proof, based as it was on L.B.'s testimony. If a doubt could be raised, the jury would acquit Emerson based on the State's failure to prove the elements of the charged offense.

On appeal, Emerson asserts that the Sixth Amendment declares that the presentation of such a defense is constitutionally faulty. Instead, Emerson alleges, the constitution mandated a single and different approach.

According to Emerson, the Sixth Amendment required defense counsel to defend in the alternative. Pointing out that this is allowed, Emerson contends that it is constitutionally required.

In Emerson's view, the only constitutionally compliant approach to defending his case was to combine his denial defense with an assertion of the affirmative defense that he reasonably believed that L.B. was capable of consent. To Emerson, it was necessary for his attorney to argue his denial defense, as was done. But it was also constitutionally required for his counsel to argue the following: if the jury unanimously found beyond a reasonable doubt that the State had proved all elements of the charge (thus plainly not crediting Emerson's testimony regarding the absence of penetration and not viewing his testimony as even creating a doubt as to that or any other element), the attorney should then have argued that Emerson nevertheless had proved by a preponderance of the evidence that L.B., despite her testimony to the contrary, had through actions and sounds, created in Emerson the reasonable belief that she was capable of consent. Moreover, because the jury would only consider the affirmative defense *after* it had unanimously concluded that all elements of the State's case had been proved beyond a reasonable doubt, his counsel would then have needed to have convinced the jury that—nonetheless—Emerson had himself proved by a preponderance of the evidence that L.B.'s testimony concerning her incapacity was most likely false and that his testimony on the subject was most likely true. We disagree that the attorney had such a mandatory duty. Many competent attorneys might consider this an unlikely result and a risk not worth taking given

17

the foreseeable possibility of such an advancement of alternative defenses undercutting the more hopeful denial defense.

Importantly, the denial defense could succeed if the jury had only a doubt about an element of the charged crime. But Emerson would have the burden of proof on his affirmative defense. This would highlight whether his testimony was proved more likely true than not true and risk taking the focus off of what the denial defense called for: a focus on whether the jury had a doubt as to the strength of the State's case and the accuracy of L.B.'s testimony.

In the end, it is plain that, at a minimum, a competent attorney could conceivably choose either strategy and adopt tactics conforming with that choice. Strickland allows the attorney to exercise this independent judgment and commands that such judgment be presumed competent.[5] On this record, Emerson fails to show deficient performance.[6]

B

Emerson next asserts that his trial counsel's decision to not pursue both a general denial defense and the "reasonable belief" affirmative defense prejudiced him. We disagree.

_____

[5] As Justice O'Connor instructed, "[m]ost important, in adjudicating a claim of actual ineffectiveness of counsel, a court should keep in mind that the principles we have stated do not establish mechanical rules." Strickland, 466 U.S. at 696. Indeed, "[t]he object of an ineffectiveness claim is not to grade counsel's performance. . . . Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result." Strickland, 466 U.S. at 697.

[6] Emerson also relies on State v. Fisher, 185 Wn.2d 836, 374 P.3d 1185 (2016), and State v. Buzzell, 148 Wn. App. 592, 200 P.3d 287 (2009), to support his assertion of ineffective assistance of counsel. However, the analysis that Emerson relies on in Fisher and Buzzell did not regard ineffective assistance of counsel but, rather, regarded a trial court's denial of a defendant's request to instruct the jury on a certain affirmative defense. 185 Wn.2d at 851-52; 148 Wn. App. at 598-600. The legal standard, actors involved, and underlying principles are not the same. Thus, Emerson's reliance on such authority is unavailing.

To establish prejudice, a defendant must show that "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" State v. Thomas, 109 Wn.2d 222, 226, 743 P.2d 816 (1987) (quoting Strickland, 466 U.S. at 694); see also Weaville, 162 Wn. App. at 823 (citing McFarland, 127 Wn.2d at 335).

> "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694; Thomas, 109 Wn.2d at 226; [State v. ]Garrett, 124 Wn.2d [504,] 519[, 881 P.2d 185 (1994)]. In assessing prejudice, "a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to the law" and must "exclude the possibility of arbitrariness, whimsy, caprice, 'nullification' and the like." Strickland, 466 U.S. at 694-95.

State v. Grier, 171 Wn.2d 17, 34, 246 P.3d 1260 (2011). In making such a determination,

> a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

Strickland, 466 U.S. at 695-96.

As set forth above, a jury instructed on a "reasonable belief" affirmative defense would not consider such a defense until after that jury had found "that the State had met its burden and proved every element of the rape charge

beyond a reasonable doubt." Powell, 150 Wn. App. at 157 n.12; see also Ervin, 158 Wn.2d at 756.

Here, Emerson testified that, during the night in question, he thought L.B. was awake, that her movements and sounds suggested to him that she was inviting sexual contact, and that no penetration had occurred. L.B. testified that she was asleep and that she woke up to Emerson's penis penetrating her vagina. After hearing this evidence, the jury found beyond a reasonable doubt that Emerson had forcefully penetrated L.B.'s vagina with his penis while she was asleep.

Emerson neither establishes nor persuasively suggests that the jury's verdict would have or might have changed had his counsel's performance not been deficient. In finding that Emerson had committed the charged conduct, the jury plainly credited L.B.'s testimony over his testimony. In order for his affirmative defense to succeed, however, the jury would need to do the exact opposite. Such a result has not been shown to be anything but extremely unlikely. Indeed, if the jury, for the purpose of finding that Emerson had engaged in conduct constituting rape in the second degree, did not find that Emerson's testimony raised a doubt as to the credibility of L.B. or the accuracy of her testimony, it is not shown to be reasonably likely that the same jury, for the purpose of evaluating his affirmative defense, would have changed its views. The record does not contain evidence giving rise to such a likelihood.[7]

---

[7] Indeed, a good deal of evidence corroborated L.B.'s testimony, including her former roommate's testimony about her perception of L.B.'s demeanor immediately after the alleged incident and her mother's testimony about missed telephone calls and her perception of her daughter's demeanor on reaching her on the morning thereafter. Furthermore, Emerson's

Thus, Emerson has not shown that his "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. This is required of him to show an entitlement to appellate relief on the claim asserted. Accordingly, Emerson's assertion of prejudice and, therefore, his assertion of ineffective representation fail.

Affirmed.

_____
Dwyer, J.

WE CONCUR:

_____     _____
Chung, J.                         Brennan, J

---

credibility before the jury was also likely diminished after testifying to having lied to both L.B. and later to a police detective during the investigation.