# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,  )  No. 79079-0-I
                      )
        Respondent,   )
                      )  DIVISION ONE
        v.            )
                      )
KEVIN LEE FORLER,     )  UNPUBLISHED OPINION
                      )
        Appellant.    )  FILED: June 10, 2019
_____)

MANN, A.C.J. — Kevin Forler appeals his conviction and sentence for attempted rape of a child. Forler makes several assignments of error, contending that (1) the trial court deprived him of an impartial jury, (2) his defense counsel was ineffective for failing to request a jury instruction on the defense of entrapment, (3) that law enforcement engaged in outrageous police conduct, (4) the trial court erred by giving the jury the "to-convict" instructions for the completed offenses, and (5) that several community custody conditions are unconstitutionally vague, overbroad, or violate his First Amendment rights.

We affirm Forler's conviction, but reverse and remand to modify the community custody conditions consistent with this opinion.

I.

Washington State Patrol Detective Carlos Rodriguez posted an ad on a Craigslist Casual Encounters forum posing as "Shannon Pearsen," a mother of two young daughters. The ad was part of a sting operation with the Kitsap Missing and Exploited Children's Task Force to apprehend people who were sexually exploiting children. The ad was titled, "New to area. Young fun family. No RP. W4M." The ad read:

> New to the area and interested in new friends. I have a very close young family that is very giving. Incest experience is a plus. Reply if interested. No RP. Only serious that want to meet respond. 43/f/Silverdale. Reply with a/s/l. I can tell you more when you respond. No solicitations but gifts are welcome. 2 dau 11/7 that are home schooled.[1]

On 12:04 a.m. on August 29, 2015, Forler responded by email: "I'm interested" and "If your [sic] real." Forler signed the email as "KF." Detective Rodriguez responded at 12:08 a.m., "Very real. Tell me what you want and then we can text/call. Available for next hour." Forler responded at 12:11 a.m., "Give me a few details" and at 12:14 a.m., with "I'm a little bit of a distance but I wouldn't mind the drive under the right circumstances." At 12:20 a.m., Forler said "I wouldn't mind a little home schooling," at 12:26 a.m., "Still there?" and at 12:47 a.m. "I'm really interested." At 12:52 a.m. Rodriguez responded, "I'm done for the night. Can chat tomorrow and maybe next week," to which Forler responded, "Yes, I'm definitely interested." Despite Rodriguez's indication that he was done talking for the night, at 12:57 a.m. Forler asked "Got any pics?" at 12:58 a.m. "or anymore details," and at 2:05 a.m. "Still awake?"

---

[1] The following abbreviations were explained by Detective Rodriguez: "RP" means role play, "a/s/l" means age, sex, location, "43/f/Silverdale" means the person posting the ad is a 43 year old female living in Silverdale, Washington, "2 dau 11/7" means two daughters, ages 11 and 7, and "home schooled" means the children are taught at home, indicating they are isolated from people who could discover abuse.

At 8:47 that morning, Forler emailed saying "Email me when you check your email." At 2:59 p.m. Detective Rodriguez responded. The detective again asked for more specific details from Forler, saying "what do you want and are you interested in my close family experience? If so tell me what your experience is and I can tell you about my family." Forler replied at 3:04 p.m., "Got more details on what you want?" and "I'm looking for the full family experience." The detective responded, "What do you mean? More details." At 3:10 p.m. Forler stated, "I'm interested in what you have to offer." Rodriguez replied, "Tell me what and only if you are serious. Who do you want? We can move to text if you are serious. There are rules and I must be very careful." At 3:13 p.m. Forler replied, "I understand" and provided his phone number.

Forler continued communicating with Detective Rodriguez through text messages. The detective asked Forler "Please tell me what you are interested in so I know if this is right for you. No R.P. No chat for hours. I am interested in meeting." Forler replied, "Home schooling. Tell me where and I'll meet." The detective replied "I need to be sure you are not a cop or any form of law enforcement. Home schooling isn't specific enough. I can't lose my kids." Forler responded, "I'm trying to be careful too. How about we meet first. Then when we are sure of each other then we can discuss other things." Rodriguez then stated "No. This isn't for you then. I never meet until I talk and you seem like a cop already." Forler responded "I have the same concern about you. This could be a sting operation." Rodriguez then tried to end the conversation by saying, "I have a system and follow same rules each time so I don't get caught. It's best we don't go further then. Good luck."

Forler reengaged: "I'm trying to be careful like you. That's why if we meet first then we've done nothing that we can get in trouble for." Detective Rodriguez responded, "I never meet till I talk on the phone. I screen on here and text because nothing but creeps on here or guys that don't want to do what they say. Too many times I have met people that do not do what they say or are just all talk. Sorry." Forler responded, "Call me." The detective replied "Maybe tomorrow." Forler attempted to continue the conversation and stated, "Then keep texting. I'm bored and excited at the possibilities." The detective responded "I'm trying to get my day planned for Monday and Tuesday so I'll pass. If you are interested, we can talk more if we like you. Then I'll send a non nude photo of my oldest." Forler responded, "I look forward to it."

Detective Rodriguez then stated, "I don't mean to come off as harsh or a bitch. I just have to be very careful. If you are really interested you will answer. Later." Then Forler gave "Shannon" a tip about "flagging" her own posts, to avoid detection by law enforcement. Forler stated, "next time you put an ad up remove it in less than hour. The longer you leave it up the more chance you have of being noticed by people you don't want seeing it" and "[l]earn how to remove them yourself. If someone flags them it means you've been noticed by someone." Finally, Forler stated "Don't want you to get busted. You have to fly under the radar. You'll have to excuse me. I've never done this before."

On August 31st, Forler and Detective Rodriguez resumed communication. The detective asked, "Are you still interested? I can talk around 1-2" and "I still want to hear what you want first so I'm not wasting my time." Forler responded, "I want to be a family friend. Are you looking for money or enjoyment?" The detective stated, "Who doesn't

-4-

like money, but I don't want to talk about that in text. I want enjoyment for my kids, and I like to watch to make sure the rules are followed." Forler responded, "I understand. I would not want anything to do with bringing harm to a child, mental or physical. What are some of your rules?" The detective responded that the rules are, "no anal and no pain. Condoms are a must. I don't need a pregnant 11-year-old." Forler responded "ok."

Forler next spoke by telephone with undercover Detective Krista McDonald. Detective McDonald went over the rules with Forler again—that Forler needed to wear a condom, and there should be no pain or anal intercourse. Detective McDonald asked Forler how large his genitals were, and whether he had any sexually transmitted diseases (STDs). McDonald told Forler that it would be difficult to explain to her doctor how an eleven year old got an STD. Forler and McDonald also discussed how many "roses" Forler should bring for each child. McDonald explained that the seven year old cost 200 roses, and the eleven year old cost 150 roses. In the commercial sex business the term "roses" refers to dollars.

After the phone conversation, Forler started sending text messages and stated that he could be at "Shannon's" apartment in about an hour. Detective Rodriguez gave Forler the address to a Burger King[2] in Bremerton to stop at before receiving the address to "Shannon's" apartment. During these exchanges, Forler sent a photo of himself, and the detective sent a photo of an undercover detective that played the mother, a photo of a state trooper who played one of the daughters, and a photo of two

---

[2] There is conflicting testimony about whether Forler stopped at a Burger King or an AMPM.

outfits for "Shannon's" daughter, asking Forler to pick which outfit her daughter should wear. Forler replied, "Black with plaid skirt."

When Forler arrived at Burger King, he called Detective McDonald for the address to "Shannon's" apartment.[3] While discussing the address, Forler asked McDonald about two vehicles across the street at the AMPM because he felt like they were watching him. Detective McDonald stated she did not know anything about the vehicles. At trial, Detective McDonald indicated that the cars Forler was worried about were not associated with the undercover operation.

After receiving the address from McDonald, Forler proceeded to the apartment complex where the operation was located. Forler was arrested when he arrived. A search of his vehicle found condoms and a bottle of Astroglide lubricant in a bag on the front seat. Forler was arrested with $260.00 in his pocket.

The State charged Forler with attempted rape of a child and commercial abuse of a child. At trial, Forler testified that he only continued conversations with "Shannon" and went to the apartment complex to find out if "real children" were involved. Forler testified that he did not intend to commit rape of a child, or commercial abuse of a child. Forler explained that he continued engaging "Shannon" by saying he was "excited at the possibilities" because if he did not use the "right words" when talking about the Craigslist ad, "[m]ost of the time—boom—you never hear from [the Craigslist poster] again" and he was trying to "make it sound like [he] was interested" so he could determine if children were at risk.

---

[3] In these operations, detectives send the target, such as Forler, to a location near the operation so that officers can identify the target before the target arrives at the operation.

Forler also indicated that he always had condoms in his car, but that he left them in the car when he arrived at the apartment complex because he had no intention of using them. When asked why Forler did not call law enforcement if he was worried children were at risk, he stated, "[l]ike with so many things, it would just fall in between the cracks and nobody would ever investigate it." Forler also testified to his belief that he was as well suited as law enforcement to investigate whether children were at risk.

The jury convicted Forler of attempted rape of a child and attempted commercial abuse of a child. The trial court sentenced Forler to the standard range of 90 months to life for attempted rape, with the sentence for the attempted commercial abuse running concurrently.

II.

Forler first contends that the trial court abused its discretion by denying his for cause challenge to juror 8. Forler argues that juror 8 demonstrated actual bias after the questionnaire phase of voir dire. We disagree.

"The right to trial by an impartial jury is guaranteed by the Sixth Amendment to the United States Constitution and article 1, section 22 of the Washington Constitution." State v. Gonzalez, 111 Wn. App. 276, 277, 45 P.3d 205 (2002). A juror will be excused for cause if the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." State v. Hughes, 106 Wn.2d 176, 181, 721 P.2d 902 (1986) (citation omitted). The standard of review for denial of a defendant's for cause challenge to seating a juror is manifest abuse of discretion. Gonzalez, 111 Wn. App. at 277.

Actual bias is a statutory for cause challenge and occurs when there is "the existence of a state of mind on the part of the juror in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging." RCW 4.44.170(2). When a juror is challenged for cause based on actual bias "it is not enough that the juror has formed an opinion on the matter . . . actual bias must be established by proof . . . and the proof must indicate that the challenged juror cannot try the issue impartially and without prejudice to the substantial rights of the party challenging." Brady v. Fibreboard Corp., 71 Wn. App. 280, 283, 857 P.2d 1094 (1993) (citations omitted). The question for the trial court is "whether a juror with preconceived ideas can set them aside." State v. Noltie, 116 Wn.2d 831, 839, 809 P.2d 190 (1991).

The court split voir dire into two phases. The first was a questionnaire phase where the potential jurors answered various written questions and were then called in individually when their answers demonstrated a hardship or bias. The court heard for cause challenges during the first phase of voir dire. The questionnaire related to hardships for serving on the jury, past experience with law enforcement, and concerns about the charges in this case. The second portion of voir dire was a general voir dire session with all remaining potential jurors. During general voir dire, the parties asked questions to all potential jurors before exercising their challenges.

On his questionnaire, Juror 8 answered "no" to "[i]s there any reason you could not be a fair juror in a criminal case?" In the space provided for further explanation after the question juror 8 wrote, "[h]owever, a case of this nature will be challenging to separate my emotion from fact. This could be typical of a juror experience." When juror

-8-

8 was called in for further questioning, the following exchange occurred between the prosecutor and juror 8:

> [Prosecutor]: Okay. You also indicated you might have a hard time being fair and impartial in this case?
>
> [Juror 8]: Yeah. I mean, I'm—this is powerful. It's just a very emotionally laden situation involving children.
>
> [Prosecutor]: Okay. Can you describe what you mean by that?
>
> [Juror 8]: Well, it's—rather than a crime against property, it's a crime against—the crime itself is against vulnerable people, in this case, children. So everything that is debated or presented as far as facts in this situation addresses whether something of that nature did or did not occur.
>
> [Prosecutor]: So without knowing any of the facts of this case at this point, you have concerns, just because of the nature of the charges, whether or not you can be—is it a question or not you can be fair and impartial, or do you think you can't be?
>
> [Juror 8]: It's a question in my mind. If we were asked this question earlier in the afternoon, I think I would have raised my hand and indicated that right away.
>
> [Prosecutor]: Okay. So you don't—
>
> [Juror 8]: I mean, I'm projecting—and this may not happen, of course. I'm projecting that, if I'm on the jury, I'm going to have to struggle with the ramifications of how the facts are going to be presented.
>
> There's a lot at stake here. There's a lot at stake here, so it's really important to try and make the decision as charged, which I think has to do with judging on the facts.
>
> [Prosecutor]: So you think you will be able to take the facts and solely base your decision on the facts of this case?
>
> [Juror 8]: I am not confident that I can. I'm just seeing it as a struggle, and I don't feel right off the bat that I can't be.

Defense counsel did not ask any additional questions, but requested that juror 8 be removed for cause. The court denied the request stating,

> I don't think I've got a clear indication, [defense counsel]. I'm going to deny cause at this time, and perhaps you can ask more questions under general voir dire. I don't have an indication from him he could not be fair and impartial one way or the other. I don't know which side, from what I heard, he might be favoring or not. His questionnaire indicates that he might have difficulty separating emotion from fact. Certainly, that may be concerning, but having difficulty on a case like this is not unusual. Right now I don't believe I have a sufficient basis.

Juror 8 answered two questions during general voir dire, but those questions were not related to his ability to be fair and impartial.[4] Defense counsel did not exercise all of Forler's peremptory challenges, leaving one before accepting the panel. Juror 8 was seated on the panel.

Forler primarily relies on Gonzalez to support his claim that juror 8 showed actual bias. In Gonzalez, the potential juror was asked if she would presume a police officer was telling the truth and equivocally answered "yes," in essence admitting "a bias regarding a class of persons" and that the "bias would likely affect her deliberations." Gonzalez, 111 Wn. App. at 279, 281. Furthermore, the potential juror expressed doubts in her ability to presume Gonzalez's innocence when faced with officer testimony. Gonzalez, 111 Wn. App. at 281. The court concluded, while "[a] prospective juror's expression of preference in favor of police testimony does not, standing alone, conclusively demonstrate bias. . . . At no time did Juror 11 express confidence in her ability to deliberate fairly or to follow the judge's instructions regarding the presumption of innocence." Gonzalez, 111 Wn. App. at 281.

Here, in contrast with Gonzalez, juror 8's statements were equivocal at best. The response to the questionnaire does not indicate actual bias. When juror 8 was interviewed individually, he conveyed the same general hesitation about the facts, but did not demonstrate actual bias toward people who abuse children or toward the prosecution or the defense. The court did not engage in any curative questioning, but that was not warranted because juror 8's answers did not indicate partiality or prejudice.

---

[4] The first question juror 8 answered related to his ability to work in groups. The second question juror 8 answered related to "group think."

While the trial court's ruling was final during the first phase of voir dire, the trial court left the door open for defense counsel to revisit the issue during general voir dire. "The trial judge is in the best position to evaluate whether a particular potential juror is able to be fair and impartial based on observations of mannerisms, demeanor and the like." Gonzalez, 111 Wn. App. at 278 (citation omitted). During general voir dire, juror 8 was asked several more questions, but those related to his ability to work in groups, and the effects of "group think" on jury deliberations.

The question to ask when determining whether a juror must be excused for cause based on actual bias is whether the juror can set aside his preconceived ideas. Noltie, 116 Wn.2d at 839. In this case, juror 8 did not indicate that he had any preconceived ideas that must be set aside to be fair and impartial. Instead, the juror was generally concerned about the subject matter, stating "I'm projecting that, if I'm on the jury, I'm going to have to struggle with the ramifications of how the facts are going to be presented." This statement is not indicative of any preconceived idea about the parties, the specific facts of the case, or the outcome, rather it demonstrated a juror who was contemplating that the facts would be difficult to hear and the case difficult to decide.

Finally, a defendant cannot show prejudice based on jury composition unless he exhausts all peremptory challenges. State v. Elmore, 139 Wn.2d 250, 277, 985 P.2d 289 (1999). Forler had the opportunity to exercise a peremptory challenge against juror 8, yet failed to exercise it; thus he cannot show prejudice. Forler fails to show that juror 8 exhibited actual bias toward the defendant or the crime charged.

III.

Forler next contends that his defense counsel was ineffective for failing to request an instruction on the defense of entrapment. We disagree. Even if Forler can show that he was entitled to a jury instruction on the defense of entrapment, Forler cannot show that his defense counsel lacked a legitimate trial strategy for not requesting the instruction.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Strickland sets forth the standard for reversal of criminal convictions based on ineffective assistance of counsel. Ineffective assistance of counsel is a two-pronged inquiry: a defendant must first show that counsel's performance was deficient and second, that the deficient performance prejudiced the defendant. Strickland, 466 U.S. at 687-88.

To show that counsel's performance was deficient, a defendant must demonstrate that representation fell below an objective standard of reasonableness. Strickland, 466 U.S. at 688 ("[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms"). "The threshold for the deficient performance prong is high, given the deference afforded to decisions of defense counsel in the course of representation." State v. Grier, 171 Wn.2d 17, 33, 246 P.3d 1260 (2010). Thus, there is a strong presumption that defense counsel's performance was reasonable. State v. Weaville, 162 Wn. App. 801, 823, 256 P.3d 426 (2011).

-12-

"Where the claim of ineffective assistance is based upon counsel's failure to request a particular jury instruction, the defendant must show he was entitled to the instruction, counsel's performance was deficient in failing to request it, and the failure to request the instruction caused prejudice." State v. Thompson, 169 Wn. App. 436, 495, 290 P.3d 996 (2012) (citing State v. Johnston, 143 Wn. App. 1, 21, 177 P.3d 1127 (2007)). If defense counsel's conduct is the product of a legitimate trial strategy or tactic, it is not deficient performance. Weaville, 162 Wn. App. at 823. "Conversely, a criminal defendant can rebut the presumption of reasonable performance by demonstrating that 'there is no conceivable legitimate tactic explaining counsel's performance.'" Grier, 171 Wn.2d at 33 (quoting State v. Reichenbach, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)).

Defense counsel was not ineffective for failing to request a jury instruction on the defense of entrapment because Forler cannot show the absence of a legitimate trial strategy for not requesting the instruction. Forler's theory at trial was to challenge the mens rea element of attempted rape of a child and attempted commercial abuse of a child. He testified that he did not go to the apartment with the specific intent to commit those crimes, rather he was trying to discern whether children were at risk. If, at the same time, Forler argued that he was entrapped by law enforcement, he would have to prove, by a preponderance of evidence, that law enforcement induced him to commit a crime he was not predisposed to commit. See State v. Smith, 101 Wn.2d 36, 43, 677 P.2d 100 (1984) (explaining that the defense of entrapment has two elements, first that the defendant was induced into committing the crime by acts of law enforcement, and second, the defendant lacked a predisposition to commit the crime).

-13-

Forler's actions, and subsequently, the defense's legal theory, were inconsistent with showing the required elements of entrapment—inducement and lack of predisposition. Considering Forler showed no resistance to the illicit activities suggested by detectives, the defense could more convincingly attack the mens rea element, arguing that Forler's attitude towards the illicit activities was explained by his purely altruistic motive of saving children. While the jury did not find the defense's theory convincing, this court does not use hindsight "to conclude that a particular act or omission of counsel was unreasonable." Strickland, 466 U.S. at 689.

Because Forler fails to show the absence of a legitimate trial strategy, he cannot show that his trial counsel was ineffective for failing to request an instruction on the defense of entrapment.

IV.

Next, Forler contends that the police conduct was so outrageous that it violated his right to due process. We disagree.

Principles of due process prevent law enforcement from invoking the judicial process to obtain a conviction based on outrageous police conduct. State v. Lively, 130 Wn.2d 1, 18-19, 921 P.2d 1035 (1996). Whether law enforcement has engaged in outrageous conduct is a question of law and reviewed de novo. Lively, 130 Wn.2d at 19.

Police conduct violates due process when the conduct "shocks the universal sense of fairness." Lively, 130 Wn.2d at 19. "Public policy allows for some deceitful conduct and violation of criminal laws by the police in order to detect and eliminate criminal activity." Lively, 130 Wn.2d at 20 (citation omitted). Dismissal based on

-14-

outrageous police conduct is reserved for only "the most egregious circumstances" and should not be invoked each time law enforcement acts deceptively. Lively, 130 Wn.2d at 20.

When evaluating whether law enforcement engaged in outrageous conduct, we focus on the State's behavior rather than the defendant's predisposition. Lively, 130 Wn.2d at 22. The court considers several factors when evaluating whether police conduct offends due process: (1) "whether the police conduct instigated a crime or merely infiltrated ongoing criminal activity," (2) "whether the defendant's reluctance to commit a crime was overcome by pleas of sympathy, promises of excessive profits, or persistent solicitation," (3) "whether the government controls the criminal activity or simply allows for the criminal activity to occur," (4) "whether the police motive was to prevent crime or protect the public," and (5) "whether the government conduct itself amounted to criminal activity or conduct 'repugnant to a sense of justice.'" Lively, 130 Wn.2d at 22 (citations omitted).

Forler urges this court to find that he was reeled in by law enforcement, similarly to the defendant in State v. Solomon, 3 Wn. App. 2d 895, 419 P.3d 436 (2018). In Solomon, we affirmed the trial court's decision to dismiss charges against a defendant because law enforcement engaged in outrageous conduct, violating the defendant's due process rights. Solomon, 3 Wn. App. 2d at 916. The facts of Solomon are in sharp contrast to this case. In Solomon, law enforcement acted in a manner repugnant to the trial judge's view of the community's sense of justice. Solomon, 3 Wn. App. 2d at 916.

In Solomon, the trial court found that law enforcement used lewd and offensive language to instigate the crime. Solomon, 3 Wn. App. 2d at 912. Solomon was

-15-

solicited in similar manner to Forler, through a Craigslist ad, advertising sex with a 15-year-old girl. Solomon, 3 Wn. App. 2d at 898. Detective Luvera used lewd language to entice Solomon to agree to meet her. Solomon, 3 Wn. App. 2d at 913-14. Solomon indicated to detectives seven times that he did not want to engage with an underage girl, and attempted to discontinue conversations. Solomon, 3 Wn. App. 2d at 913-14. Each time, Detective Luvera engaged in more persistent solicitation. Solomon, 3 Wn. App. 2d at 913-14.

The trial court also found that the State controlled the criminal conduct by stringing Solomon along over the course of four days, despite Solomon's seven attempts to discontinue conversations. Solomon, 3 Wn. App. 2d at 914. Finally, the trial court found that Detective Luvera's "use of graphic and highly sexualized language amounted to a manipulation of Solomon and was repugnant to a sense of justice." Solomon, 3 Wn. App. 2d at 915.

Comparing Solomon to the facts in this case, Forler continued to instigate the conversations, even after offered the chance to cease communications. Even though Detective Rodriguez attempted to discontinue conversations by saying "[i]t's best we don't go further then. Good luck," Forler responded and continued conversations. At no point did Forler express disinterest in "Shannon's" offer. In this case, law enforcement used code words, such as "home-schooling" and "family experience" instead of the highly sexualized and graphic language that Detective Luvera used in Solomon. Therefore, law enforcement's conduct was not repugnant to a sense of justice and the primary motive was to prevent people from exploiting children.

Forler also unsuccessfully analogizes this case to Lively. In Lively, a police informant convinced Lively—an alcoholic in "extreme distress"—to deliver cocaine to an undercover officer. Lively, 130 Wn.2d at 25-26. Law enforcement actively solicited Lively at a Narcotics Anonymous and Alcoholics Anonymous meeting where she was receiving treatment. Lively, 130 Wn.2d at 23, 25. Lively began living with the informant and eventually the informant asked Lively to marry him. Lively, 130 Wn.2d at 7, 25. Lively delivered the cocaine to the undercover officer at the informant's apartment. Lively, 130 Wn.2d at 26. The court concluded that Lively agreed to the transaction in part due to her emotional dependence on the informant. Lively, 130 Wn.2d at 26.

In addition, the court determined that the informant, at the request of law enforcement, controlled the criminal activity from start to finish, from scheduling when Lively would obtain the cocaine to allowing Lively to use the informant's car. Lively, 130 Wn.2d at 26. Finally, the court concluded that condoning the police conduct, when the police solicited a recovering addict at an Narcotics Anonymous and Alcoholics Anonymous meeting, who was in extreme emotional distress, had previously attempted suicide, and where the police had no evidence that she was involved in any criminal activity, was contrary to public policy and to basic principles of human decency. Lively, 130 Wn.2d at 27.

Viewing the totality of the police conduct, Forler fails to show that the undercover Craigslist operation was so outrageous that it violated his due process rights. Here, the police conduct was aimed at infiltrating ongoing criminal activity on the "Casual Encounters" forum on Craigslist, by engaging people who were predisposed to sexually abuse children. Forler's only instances of reluctance were when he was worried it was

a "sting operation," and mentioned he felt like people were watching him while he waited at Burger King for "Shannon's" address. From this evidence, Forler has not shown that law enforcement used excessive persuasion to overcome his reluctance.

While the detectives controlled the Craigslist ad and the age of "Shannon's" two daughters, detectives were not coercive or overly persistent when engaging Forler. The conversation developed mostly from Forler's insistence to continue discussions. At one point, the detectives even attempted to cease communications with Forler when "Shannon" stated, "I have a system and follow the same rules each time so I don't get caught. It's best we don't go further then. Good luck," but even after this statement, Forler continued to engage detectives in conversation.

Unlike Solomon and Lively, Forler is unable to show that law enforcement controlled the criminal activity from start to finish. Forler used his own transportation to travel to "Shannon's" apartment, and brought condoms and money as requested by the detectives. Finally, the government's conduct was not repugnant to a sense of justice because the government did not unduly pressure Forler into the arrangement. Instead, Forler chose to drive over an hour to the designated location, for what he was told was sex with two children, ages seven and eleven.

## V.

Forler next argues that providing the jury with the to-convict instructions for the completed crimes of rape of a child in the first degree and commercial sexual abuse of a minor, was instructional error and a manifest violation of due process. We disagree.

We review alleged instructional errors de novo. State v. Becklin, 163 Wn.2d 519, 525, 182 P.3d 944 (2008). Because Forler did not object to the jury instructions below,

-18-

RAP 2.5(a) prevents him from raising this issue for the first time on appeal unless he can show that providing the instructions was "manifest error affecting a constitutional right." RAP 2.5(a). State v. O'Hara, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). To meet RAP 2.5(a), the appellant must demonstrate that the error is both manifest and truly of constitutional dimension. State v. Kirkman, 159 Wn.2d 918, 926-27, 155 P.3d 125 (2007). "Stated another way, the appellant must 'identify a constitutional error and show how the alleged error actually affected the [appellant]'s rights at trial.'" O'Hara, 167 Wn.2d at 98 (quoting Kirkman, 159 Wn.2d at 926-27). Manifest error requires a showing of actual prejudice. Kirkman, 159 Wn.2d at 935.

Actual prejudice is a "plausible showing by the [appellant] that the asserted error had practical and identifiable consequences in the trial." Kirkman, 159 Wn.2d at 935. The focus is on whether the error is so obvious that it warrants appellate review. State v. McFarland, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995). The appellate court "must place itself in the shoes of the trial court to ascertain whether, given what the trial court knew at the time, court could have corrected the error." O'Hara, 167 Wn.2d at 100. If the reviewing court determines that the claim raises a manifest constitutional error, "it may still be subject to a harmless error analysis." McFarland, 127 Wn.2d at 333.

The prosecution must prove every element of the crime charged beyond a reasonable doubt. State v. Brown, 147 Wn.2d 330, 339, 58 P.3d 889 (2002). A to-convict instruction must contain all elements of the crime. State v. Smith, 131 Wn.2d 258, 263, 930 P.2d 917 (1997). A conviction cannot stand if the jury is instructed in a manner that lessens the State's burden. Brown, 147 Wn.2d at 339 (citation omitted).

The State proposed to-convict instructions for the attempted rape of a child in the first degree and attempted commercial sexual abuse of a minor. Instruction 14 provided in relevant part:

To convict the defendant of Attempted Rape of a Child in the First Degree as charged in Count I, each of the following elements of the crime must be proved beyond a reasonable doubt—

(1)	That on or about August 31, 2015, the defendant did an act which was a substantial step toward the commission of Rape of a Child in the First Degree;

(2)	That the act was done with intent to commit Rape of a Child in the First Degree; and

(3)	That the acts occurred in the State of Washington.

The State also proposed giving to-convict instructions for the uncharged crimes of rape of a child in the first degree and commercial sexual abuse of a minor.

Instruction 13 provided in relevant part:

To convict the defendant of the crime of Rape of a Child in the First Degree, each of the following elements of the crime must be proved beyond a reasonable doubt:

(1)	That on or about August 31, 2015, the defendant had sexual intercourse with a child;

(2)	That the child was less than twelve years old at the time of the sexual intercourse and was not married to the defendant;

(3)	That the child was at least twenty-four months younger than the defendant; and

(4)	That this act occurred in the State of Washington.

The State argued that the to-convict instructions for the completed but uncharged crime was appropriate because it had to prove that the "defendant intended to commit rape of a child in order to prove that he attempted to commit rape of a child." In permitting both sets of to-convict instructions, the trial court noted that the definition of

-20-

attempted rape referred back to a substantial step towards the commission of the completed crime.

Fowler argues that by providing the to-convict instructions for the completed crimes, the court

> [p]lac[ed] the notion before the jury that a real child could have been subjected to sexual intercourse on that given date of August 15 [sic], the instruction served to focus the jury on the specter of horrific conduct that could possibly have occurred under different facts. This made it easier for the jury to convict Mr. Forler of the crime charged, that crime seeming, in comparison, to be less grave than what might have happened.

This argument, however, ignores the purpose of punishing inchoate crimes. It is irrelevant whether a "real child" was involved in this case. "It is generally of no consequence in the context of an anticipatory or inchoate offense, what the actual attendant circumstances were at the time the actor engaged in proscribed conduct," the question is what the defendant "believed the attendant circumstances to be." State v. Nelson, 191 Wn.2d 61, 70, 419 P.3d 410 (2018); see also RCW 9A.28.020(2) ("it is no defense to a prosecution of such attempt that the crime charged to have been attempted was, under the attendant circumstances, factually or legally impossible of commission"); State v. Johnson, 173 Wn.2d 895, 909, 270 P.3d 591 (2012) (In a case of commercial sexual exploitation of minors, "the State was required to prove that [the defendant] believed his victims to be minors to prove that he intended to advance or profit from the commercial sexual exploitation of a minor.").

In order to find Forler guilty of the attempted crimes, the jury was required to find that Forler intended to commit rape of a child and commercial sexual abuse of a "real child," and therefore had formed the specific intent to commit each crime. Forler argues

-21-

the to-convict instructions caused the jury to consider the "specter of horrific conduct that could possibly have occurred under different facts." But what Forler describes is exactly what the jury would consider without the to-convict instructions for the completed crimes because whether a real child was involved was irrelevant to the State's burden of proving the defendant's intent and belief.

The trial court provided the jury with additional instructions—it was not missing any instructions nor did it eliminate any of the necessary elements in the to-convict instructions for the attempted crimes. Including separate to-convict instructions for the completed crimes did no more than inform the jury of the elements of the underlying crime that Forler was accused of attempting. This was not manifest error. Forler cannot demonstrate actual prejudice—he cannot point to any practicable or identifiable consequences at trial that are readily discernable on the record. Kirkman, 159 Wn.2d at 935.

The to-convict instructions for the completed offenses did not lessen the State's burden of proof or cause manifest constitutional error.

VI.

Finally, Forler challenges several community custody conditions on the basis of scrivener's errors, vagueness, and overbreadth. The State concedes that certain community custody conditions should be stricken or modified in the judgment and sentence to match appendix F. We will address each in turn.

A defendant may challenge an illegal or erroneous sentence for the first time on appeal. State v. Bahl, 164 Wn.2d 739, 744, 193 P.3d 678 (2008). We review de novo whether the trial court had statutory authority to impose community custody conditions.

-22-

State v. Armendariz, 160 Wn.2d 106, 110, 156 P.3d 201 (2007). If the condition is statutorily authorized, we review the imposition of crime-related prohibitions for abuse of discretion. Armendariz, 160 Wn.2d at 110 (citation omitted). Conditions that do not reasonably relate to the circumstances of the crime, the risk of reoffense, or public safety are unlawful, unless those conditions are explicitly permitted by statute. State v. Jones, 118 Wn. App. 119, 204, 76 P.3d 258 (2003). Additionally, the remedy for scrivener's errors in the judgment and sentence is remand to the trial court for correction. CR 7.8(a); see RAP 7.2(e).

Consume no alcohol

Forler challenges the condition that he "Consume no alcohol, if so directed by the COO" as previously stricken by the trial judge in appendix F. The State concedes this issue. Since the trial court correctly struck this condition from appendix F as not crime-related, we remand to the trial court to strike "Consume no alcohol, if so directed by the COO" from the judgment and sentence supervision schedule.

Contact with victims

Forler challenges the condition "Have no direct or indirect contact with victim(s) or his or her family, including by telephone, computer, letter, in person, or via third party" as previously stricken by the trial judge in appendix F. The State concedes this issue. Since the trial court correctly struck this condition from appendix F because the victim of this crime was the State, we remand to the trial court to strike "Have no direct or indirect contact with victim(s) or his or her family, including by telephone, computer, letter, in person, or via third party" from the judgment and sentence supervision schedule.

-23-

## Frequent adult book stores

Forler challenges the condition "Frequent no adult book stores, arcades, or places providing sexual entertainment" as previously stricken by the trial judge in appendix F. The State concedes this issue. Since the trial court correctly struck this condition in appendix F, as not crime-related, we remand to the trial court to strike "Frequent no adult book stores, arcades, or places providing sexual entertainment" from the judgment and sentence supervision schedule.

## Contact 900 telephone numbers

Forler challenges the condition "Contact no '900' telephone numbers that offer sexually explicit material. Provide copies of phone records to CCO" in the judgment and sentence supervision schedule, and "Do not contact (900) telephone numbers that offer sexually explicit material and provide copies of phone records to CCO upon request" in appendix F as unrelated to the crime Forler committed. The State concedes this issue. Since this condition is not crime-related, we remand to the trial court to strike "Contact no '900' telephone numbers that offer sexually explicit material. Provide copies of phone records to CCO" from the judgment and sentence supervision schedule, and "Do not contact (900) telephone numbers that offer sexually explicit material and provide copies of phone records to CCO upon request" from appendix F.

## Possession of sexually explicit materials

Forler challenges the condition "Possess/access no sexually explicit materials (as defined by Defendant's treating therapist or CCO)" in the judgment and sentence supervision schedule as previously modified by the trial judge in appendix F. The State concedes this issue. Since the trial court previously modified this condition to be

-24-

sufficiently crime-related, we remand to the trial court to modify the condition in the judgment and sentence supervision schedule to match appendix F: "Do not possess or access any sexually explicit material depicting minors."

Access sexually explicit materials by computer

Forler challenges the condition "Possess/access no sexually explicit materials, and/or information pertaining to minors via computer (i.e. internet)" in the judgment and sentence supervision schedule as previously modified by the trial judge in appendix F. The State concedes this issue. Since the trial court previously modified this condition to be sufficiently crime-related, we remand to the trial court to modify the condition in the judgment and sentence supervision schedule to match appendix F: "Do not access sexually explicit materials that are intended for sexual gratification involving minors."

Internet use

Finally, Forler challenges the condition "No internet use unless authorized by treatment provider and Community Custody Officer" as unconstitutional on both vagueness and overbreadth grounds, and as violating his First Amendment rights. We agree.

The constitutional protections of due process in the Fourteenth Amendment to the United States Constitution and article 1, section 3 of the Washington Constitution prohibit vague laws. Bahl, 164 Wn.2d at 752-53. Laws must provide ordinary people fair warning of proscribed conduct and have standards that are definite enough to protect against arbitrary enforcement. Bahl, 164 Wn.2d at 752-53. If a community custody condition does either, it is unconstitutionally vague. Bahl, 164 Wn.2d at 752-53. When reviewing the challenged language to determine if it is sufficiently definite to

provide fair warning, the court must read the language in context and give it a "sensible, meaningful, and practical interpretation." City of Spokane v. Douglass, 115 Wn.2d 171, 180, 795 P.2d 693 (1990). Applying this standard to community custody conditions, a condition is sufficiently definite if persons of ordinary intelligence would understand what behavior is proscribed. Douglass, 115 Wn.2d at 179. Where community custody conditions prohibit material protected by the First Amendment, stricter standards of definiteness are required. State v. Nguyen, 191 Wn.2d 671, 679, 425 P.3d 847 (2018) (citing Bahl, 164 Wn.2d at 753.).

In State v. Irwin, this court held that a community custody condition that prohibited "frequent[ing] areas where minor children are known to congregate, as defined by the supervising CCO" was unconstitutionally vague because "[w]ithout some clarifying language or an illustrative list of prohibited locations . . . the condition does not give ordinary people sufficient notice to 'understand what conduct is proscribed.'" 191 Wn. App. 644, 655, 364 P.3d 830 (2015). Furthermore, including "as defined by the supervising CCO" did not remedy the constitutional violation, even though it could provide Irwin with fair warning once the CCO gave Irwin a restrictive list, because "'it would leave the condition vulnerable to arbitrary enforcement.'" Irwin, 191 Wn. App. at 665 (citation omitted). Similarly in Bahl, our Supreme Court held that because the CCO could "direct what falls within the condition only makes the vagueness problem more apparent, since it virtually acknowledges that on its face it does not provide ascertainable standards for enforcement." Bahl, 164 Wn.2d at 758.

Similarly here, "No internet use unless authorized by treatment provider and Community Custody Officer" is unconstitutionally vague because it fails the second

prong of the vagueness analysis. The condition does not protect against arbitrary enforcement, because it does not provide ascertainable standards for enforcement.

The condition also fails because it is unconstitutionally overbroad. "A criminal statute that sweeps constitutionally protected free speech activities within its prohibitions may be overbroad and thus violate the First Amendment." State v. Bahl, 137 Wn. App. 709, 714, 159 P.3d 416 (2007), rev'd on other grounds, 164 Wn.2d 739 (2007). In the context of community custody conditions, "[a]n offender's usual constitutional rights during community placement are subject to [Sentencing Reform Act (SRA)]-authorized infringements." State v. Hearn, 131 Wn. App. 601, 607, 128 P.3d 139 (2006) (citation omitted). A court's imposition of crime-related prohibitions authorized by the SRA will be reversed only if it is manifestly unreasonable. State v. Riley, 121 Wn.2d 22, 37, 846 P.2d 1365 (1993).

The prohibition on "no internet use," is manifestly unreasonable. Forler was convicted of attempted rape a child by soliciting an undercover officer through Craigslist's Causal Encounters forum. The blanket restriction of "no internet use" goes beyond tailoring Forler's internet use to a crime-related prohibition. Today, internet use is ubiquitous, allowing people to easily accomplish many daily tasks and functions, including but not limited to: finding a job or housing, managing banking and investment accounts, paying bills, receiving directions, listening to music, reading the news, and connecting with friends and family. The list provided is only a short list of what can be accomplished using the internet. But none relate to Forler's conviction. Furthermore, many devices such as televisions are "smart devices" and require an internet connection to access their "smart" features. Under the broad community custody

condition here, Forler would be in violation if he used a "smart device" that was connected to the internet.

Because we find that the community custody condition is both unconstitutionally vague and overbroad, we decline to reach Forler's argument that the condition also violates his First Amendment rights. We remand to the trial court to modify the condition in appendix F to include limiting language that prohibits Forler from using the internet to solicit minors, and to include the same language in the judgment and sentence supervision schedule.

We affirm Forler's conviction, but reverse and remand to modify the community custody conditions consistent with this opinion.

_Mann, A.C.J._

WE CONCUR:

_Chun, J._                    _Andrus, J._

-28-