IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>                    Respondent,<br><br>          v.<br><br>TARAILLE DUJUAN CHESNEY,<br><br>                    Appellant. | No. 80873-7-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

COBURN, J. — A jury convicted Taraille Dujuan Chesney of custodial interference in the first degree, attempting to elude a police vehicle (with a special finding of endangerment by eluding), theft in the third degree, driving while under the influence, and two counts of reckless endangerment. Chesney appeals his convictions and claims the trial court violated his constitutional right to a speedy trial when it granted numerous "largely unjustified continuances" over his objections while he was incarcerated for 18 months awaiting trial. But all of the continuances were requested by defense counsel and necessary for defense preparation, the delay was not extreme, and Chesney does not articulate particularized prejudice. The delay did not violate Chesney's constitutional speedy trial rights and the claims Chesney asserts in his pro se statement of additional grounds lack merit. We affirm Chesney's convictions.

Citations and pin cites are based on the Westlaw online version of the cited material.

FACTS

Taraille Chesney's convictions stem from events that occurred on March 28, 2018, after he arrived unexpectedly at the Lake Forest Park home of Leslie Dempsey, the grandmother and custodian of his two children. Chesney ignored Dempsey's requests to leave. Chesney gave the children a pruning saw from the garage and instructed them to use it for protection. Dempsey called 911. Although Chesney was not allowed unsupervised visits with his children, he eventually left with his five-year-old child, speeding away in a vehicle without a child car seat installed. When he left Dempsey's home, Chesney took Dempsey's cell phone without her permission. Lake Forest Park police officers located Chesney nearby, but were unable to stop him as he drove at high speeds through residential streets. Police initiated an "Amber Alert" for Chesney's minor child.

Seattle police officers eventually located Chesney in Seattle, but he again avoided detention by driving away when officers approached his car. Chesney approached a nearby intersection in the bike lane and on the sidewalk, and when a police officer tried to block his vehicle, he drove into the officer's patrol car. Chesney then tried to escape by driving into oncoming traffic, and in the process, collided with two more patrol cars. Chesney's vehicle was eventually immobilized, and officers removed Chesney's child from the vehicle and took Chesney into custody.

The State charged Chesney with five crimes that arose from law enforcement's attempts to apprehend him in Seattle: attempt to elude a pursuing

police vehicle, reckless endangerment, and three counts of assault in the third degree. The trial court arraigned Chesney on April 12, 2018. In April and May of 2018, Chesney's counsel sought two initial continuances to enable review of in-car video (ICV) evidence she requested and received from the State. The State joined and Chesney agreed with those requests. The court set trial for July 17, 2018.

Between June 2018 and April 2019, the court granted six substantial continuances. Three months after the State filed charges, on June 29, 2018, the State and defense counsel jointly requested that the court continue the trial until August 14. The prosecutor explained that the underlying crimes were investigated separately by the Seattle Police Department (SPD) and the Lake Forest Park Police Department (LFPPD). She further explained that two weeks before the hearing, following the referral of the case from the LFPPD, the prosecutor's office notified defense counsel that the State intended to add charges and provided "significant discovery" to the defense. Defense counsel informed the court that she was reluctantly requesting a continuance over Chesney's objection because she needed additional time to review the new discovery. The court granted the request, explaining that defense counsel could not effectively represent Chesney without examining all the evidence.

On August 3, the State requested a six-week continuance, until October 1, 2018, based on the unavailability of a number of witnesses during the timeframe of the scheduled trial and because the defense had not yet interviewed witnesses. The defense joined in the State's request, again over Chesney's

3

objection.  Defense counsel also noted, based on video evidence she had reviewed, that "a number" of witnesses needed to be interviewed and there was "some outstanding discovery" that she understood to be "on its way."  Because "critical" State witnesses were not available, and in order to ensure effective representation by the defense, the court granted the request.

Then, on September 14, defense counsel sought to continue the trial for approximately two months, until December 2018.  Defense counsel stated that since the court granted the previous continuance, she had received more than 400 pages of new discovery.  Counsel also said she had learned there were witnesses to the alleged custodial interference, she needed assistance from the State to locate some of them, and she was waiting for a finalized witness list and toxicology results.  Counsel also represented that, according to her discussions with the State, the trial was expected to take approximately three weeks.  The State responded that it was prepared for trial and objected to the continuance. Chesney also objected.

In response to the trial court's questions, the prosecutor estimated there would be approximately 30 potential witnesses.  The court granted the motion to continue, reasoning that counsel could not adequately defend against the charges without interviewing the State's witnesses.  The court also ruled that the State should provide a finalized witness list within a month, by October 12.

Next, on November 16, the defense requested another continuance of approximately two months, until February 20, 2019.  Defense counsel advised the court that the State had identified 50 witnesses and that interviews of those

4

witness were ongoing, but far from complete. Citing the "volume" of witnesses, the State did not object. Again, although Chesney objected to a continuance of any length, the court granted the motion, stating that his right to effective counsel was as important as his right to a speedy trial.

On February 8, 2019, defense counsel again moved to continue the trial to the end of April. Counsel informed the court that the interview process was still ongoing and she recently realized that she did not yet have toxicology results. The newly assigned prosecutor confirmed that the day before the hearing, she had apprised the defense of the ultimate charges the State would pursue.[1] Although Cheney objected to the continuance because he wanted to go to trial and was not "worried" about new charges, the court granted the motion based on defense counsel's representation that she needed additional time to prepare in order "to be effective."

On April 19, 2019, the State sought the last lengthy continuance, to July 8, due to the unavailability of one of the victims. Although the parties had discussed amendment to the information at several points, the prosecutor also confirmed that the State would amend the charges if the case went to trial. The defense joined in the request to continue, noting that there were now over 40 witnesses on the final witness list, several of whom had yet to be interviewed, partly because the defense was waiting for ICV evidence as to at least four of the

---

[1] Although the State indicated at this hearing it would amend the custodial interference charge to first degree kidnapping, it did not ultimately charge Chesney with kidnapping.

5

victims.[2]  The defense also alerted the court that Chesney had not yet received discovery that he personally wanted to review, although the redacted discovery had previously been approved and sent to the jail.  The State responded that it was "working" to obtain the outstanding ICV evidence and that the delay was likely related to damage sustained by the vehicles in question resulting from the crimes.

The court granted the continuance, observing that without reviewing the outstanding ICV evidence, defense counsel could not be prepared for trial.  But the court warned the parties that it was "unlikely" to grant any further continuances.  The combined effect of these six continuances delayed the trial for a year, from July 2018 to July 2019.

The trial court granted no further lengthy continuances.  However, between July 2019 and October 2019, the court granted approximately 25 brief continuances, for the most part because either defense counsel or the prosecutor was in trial, or because of the lack of judicial availability.  Sixteen of these continuances were for one or two days.

The State filed an amended information on October 8, 2019, adding seven new charges for a total of 12 counts. The new charges included custodial interference, domestic violence felony violation of a court order, theft in the first degree, driving under the influence, an additional count of reckless endangerment, and two additional charges of assault in the third degree.  Pretrial

---

[2] The comments at this hearing suggest that the State may have amended the final witness list at some point.

proceedings and jury selection took place in early October 2019 and trial began on October 15, 2019. More than 30 witnesses testified over the course of several weeks and the jury considered more than 50 exhibits. The jury convicted Chesney of a total of six charges, including the felony charges of attempting to elude and custodial interference, and four misdemeanor charges: the lesser included offense of theft in the third degree, driving under the influence, and two counts of reckless endangerment. The jury acquitted Chesney of theft in the first degree and three counts of assault in the first degree and was unable to reach a verdict as to three counts (felony violation of a court order and two charges of assault in the third degree). The court granted a mistrial as to those three counts.

The court sentenced Chesney to a high-end standard range sentence of 29 months on the felony counts, plus 12 months and a day based on aggravating circumstances found by the jury, for a total sentence of 41 months.[3] In sentencing Chesney, the court observed that the case was the "most egregious case of attempting to elude a pursuing police vehicle" the court had ever seen. Chesney appeals.[4]

---

[3] The court ordered 364-day sentences on the misdemeanor counts, ordered the sentences to run consecutively with the felony counts, but it suspended those sentences.

[4] In addition to his claim based on the constitutional right to a speedy trial, Chesney initially alleged on appeal a violation of double jeopardy based on the jury's special finding of endangerment by eluding and his separate convictions of reckless endangerment. And he alleged error in the judgment and sentence. In response, the State agreed to voluntarily dismiss Chesney's reckless endangerment convictions and to correct the scrivener's error in the judgment. This court later stayed Chesney's appeal, granted his motion to remand for resentencing in light of State v. Blake, 197 Wn.2d 170, 481 P.3d 521 (2021), and

DISCUSSION

We review an alleged violation of a defendant's Sixth Amendment right to a speedy trial de novo. State v. Ollivier, 178 Wn.2d 813, 827, 312 P.3d 1 (2013).

"[T]he analysis for speedy trial rights under article I, section 22 [of the Washington Constitution] is substantially the same as the Sixth Amendment analysis." Ollivier, 178 Wn.2d at 826 (citing State v. Iniguez, 167 Wn.2d 273, 289, 217 P.3d 768 (2009)). The United States Supreme Court adopted a balancing test in Barker v. Wingo, 407 U.S. 514, 529-30, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972) to analyze alleged speedy trial right violations. Iniguez, 167 Wn.2d at 283 (citing Barker, 407 U.S. at 530). The Barker analysis is "fact-specific" and necessarily depends on the particular circumstances of the case. Ollivier, 178 Wn.2d at 827. The analysis requires us to weigh the conduct of both the prosecution and the defendant. Ollivier, 178 Wn.2d at 827.

Our courts recognize that some amount of pretrial delay is "often 'inevitable and wholly justifiable.' " Iniguez, 167 Wn.2d at 282 (quoting Doggett v. United States, 505 U.S. 647, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992)). To trigger the Barker balancing test, a defendant must first show that the delay crossed the line from ordinary to "presumptively prejudicial." Iniguez, 167 Wn.2d at 283. If a defendant meets this threshold test, the court then considers a number of factors to determine if the delay constitutes a constitutional violation:

---

authorized the trial court to address all sentencing issues raised by the parties. On remand, the trial court resentenced Chesney to 38 months based on a reduced offender score and corrected the scrivener's error in the judgment and sentence. The State also filed an order voluntarily dismissing the reckless endangerment counts.

(1) the length of the delay, (2) the reason for the delay, (3) whether and to what extent the defendant asserted his speedy trial rights, and (4) whether the delay caused prejudice to the defendant. Barker, 407 U.S. at 530-32. While no factor is necessary or alone sufficient to establish a violation, they assist in our determination of "whether a particular defendant has been denied the right to a speedy trial." Ollivier, 178 Wn.2d at 827.

The delay here of a year and a half is sufficient to trigger the Barker analysis. See State v. Hatt, 11 Wn. App. 2d 113, 153, 452 P.3d 577 (2019) (An 18-month delay in prosecution for first degree murder exceeded the threshold to require a Barker analysis). We must therefore proceed to balance the Barker factors.

### Length of Delay

The length of delay for purposes of the Barker analysis is a different assessment than during the threshold phase. Iniguez, 167 Wn.2d at 293. Here, Chesney argues that the length of the delay weighs in his favor because he was incarcerated for 10 months longer than the defendant in Iniguez[5] and did not face complex charges. Chesney acknowledges that in Ollivier, a 22-month delay did not weigh in the defendant's favor but argues that Ollivier is distinguishable because the evidence involved computer forensic analysis and, in any event, we should disregard the Supreme Court's decision in Ollivier because its analysis of the first factor of Barker is "incorrect and harmful."

---

[5] The court in Iniguez determined that an 8-month pretrial delay weighed "only slightly" against the State. Iniguez, 167 Wn.2d at 293.

As the State points out, we are bound to follow directly controlling authority of the Supreme Court. State v. Gore, 101 Wn.2d 481, 487, 681 P.2d 227 (1984). And in assessing this factor, the court in Ollivier considered the fact that the bulk of the continuances were sought by defense counsel to ensure adequate preparation to be "an extremely important aspect of the balancing [test]." Ollivier, 178 W.2d at 831. And here, while the delay was significant and Chesney was incarcerated for the entire time, the defense requests were primarily responsible for the delay and it was not unduly or unnecessarily long in light of the relatively complicated factual nature of the case involving different locations, numerous witnesses, and extensive video and other physical evidence. See Ollivier, 178 Wn.2d 829 (describing a number of speedy trial challenges involving delays ranging from 21 months to 58 months as not "exceptionally long"). The first Barker factor is, at best, neutral.

### Reason for Delay

This factor requires the court to examine each party's responsibility for the delay and weigh their respective reasons. Iniguez, 167 Wn.2d at 294. Again, the majority of continuances were requested to enable defense preparation, while only approximately 10 days' of delay was attributable solely to the State.

All of the continuances granted between June 2018 and April 2019, including those initiated by State's motions, were supported by the defense to further the preparation of Chesney's trial defense. The delay resulting from continuances granted in June, August, and September 2018 were also partially related to the fact that the incidents at Dempsey's home were investigated

separately from those that took place in Seattle, and the materials related to the LFPPD's investigation of those events were not available when the State initially filed charges. The results of the LFPPD's investigation both provided a basis for additional serious charges against Chesney and generated a significant amount of additional discovery provided to the defense in the summer and fall of 2018.

The delays were also related to the nature of the discovery. In addition to new documentary evidence defense counsel reported having received in June and August 2018, because of the number of police officers and police vehicles involved in the case, both body camera footage and ICV evidence was critical evidence. Counsel reported receiving new batches of video evidence that required additional time to review. And recovery of some of the ICV footage was apparently delayed because of damage to the police vehicles involved.

The most significant issue underlying all of the continuance requests was the sheer number of potential witnesses. Not only were there multiple victims, including Dempsey, Chesney's child, his passenger, and multiple police officers, there were a number of police officers involved in the pursuit of Chesney's vehicle, witnesses who were "calling in" at the time of the chase, and witnesses present at Dempsey's home. Some witnesses required the State's assistance to locate. The defense's requests to continue between September 2018 and April 2019 were expressly based on the need for additional time to interview the potential witnesses identified by the State, a substantial number of whom testified

at trial.[6]  Although Chesney was understandably frustrated by the delays, continuances to enable counsel to investigate or prepare for trial are binding on the defendant, even if the defendant objects.  Ollivier, 178 Wn.2d at 824 (citing CrR 3.3(f)(2)).

Chesney nevertheless argues the continuances are not chargeable to him in these circumstances because his counsel did not seek continuances for "legitimate trial preparation purposes" and because the State's "abusive tactics and untimely disclosures" were the underlying cause of counsel's requests.  We disagree.  The record does not support Chesney's characterization of the State's conduct or the causes of delay.  There is nothing in the record to suggest that the government deliberately delayed the trial to obstruct the defense.  See Barker, 407 U.S. at 531.  Specifically, the record does not demonstrate that defense counsel was forced to seek continuances because of the State's delay in providing a finalized witness list or the toxicology report.  Although the State did not provide a final witness list until October 2018, defense counsel's statements at the August 2018 and September 2018 hearings indicate that defense counsel already knew the identity of many potential witnesses and the issue was the time required to locate and interview potential witnesses, not disclosure of their identity.  Similarly, it does not appear that the failure to timely provide the toxicology report significantly impaired the defense investigation, especially given that Chesney admitted to police officers at the time of his arrest that he had

_____

[6] The number of witnesses, and availability of those witnesses for trial, was also the primary reason the State advocated for continuances in August 2018 and April 2019.

consumed methamphetamine, crack, and alcohol and testified at trial that he consumed drugs the day before. Although delay in reviewing ICV evidence related to four named victims, as of April 2019, may have slowed the progress of the defense investigation to some extent, as explained, the missing evidence was connected to vehicles damaged during the crimes. Chesney fails to establish that the State's conduct was the cause for delay in providing this discovery.[7]

The record also does not support the claim that the State deliberately "blindside[d]" the defense by promising a witness list of no more than 30 individuals and then, without explanation, identifying approximately 50 individuals as witnesses. The State promised only to finalize the witness list by a certain date. And it appears that the estimated number of witnesses simply evolved as the case developed. No authority supports Chesney's apparent position that identifying a large number of witnesses was an abusive tactic, especially in a case involving numerous charges, victims, eye witnesses, physical locations and different investigating law enforcement agencies.[8]

Chesney suggests that even if the State did not deliberately attempt to delay his trial, the circumstances, at best, indicate delay resulting from

---

[7] To the extent that Chesney claims his trial counsel "acquiesced" in the State's delay tactics and thereby behaved inconsistently with counsel's "ethical obligations," Chesney does not contend that he was deprived of effective assistance of counsel with respect to counsel's trial preparation.

[8] The fact that the trial court at one point remarked that the trial testimony presented by the State had become repetitive does not suggest impropriety in the number of witnesses the State identified. The prosecution is generally entitled to prove its case with "full evidentiary force." State v. Taylor, 193 Wn.2d 691, 444 P.3d 1194 (2019).

"institutional dysfunction."  For instance, while the defense sought a continuance in June 2018 primarily to review discovery related to the LFPPD's investigation, Chesney points out that the State was aware of the "Amber Alert" issued by the LFPPD when it filed the initial charges on March 30, 2018, two days after the incident. Therefore, he claims it was unnecessary for the State to wait until June 2018, more than two months later, to obtain and turn over discovery from the LFPPD.  But of course, the LFPPD had to conduct an investigation before the State and the defense could obtain the results. And we cannot determine that institutional dysfunction was involved here solely based on the fact that the SPD provided the results of its investigation before the LFPPD.  Moreover, even where present, "institutional dysfunction" is attributable, but weighs less heavily, against the State than deliberate delay.  Ollivier, 178 Wn.2d at 837.

In sum, most of the continuances here were sought by defense counsel to provide for adequate investigation and preparation for trial.  And defense counsel required additional preparation time, not because of abusive litigation tactics, but largely due to the complexity of the facts and the investigation process, the number of potential witnesses that the defense needed to interview, and the considerable volume of evidence. This factor weighs against Chesney. See Ollivier, 178 Wn.2d at 831.

Assertion of Right

This factor requires the court to consider the extent to which the defendant asserted his speedy trial right.  Iniguez, 167 Wn.2d at 294-95.  It is undisputed that Chesney objected to each lengthy continuance granted between June 2018

and April 2019. On the other hand, Chesney's counsel acted as his agent and was responsible for investigating the evidence and his potential defenses and, as the trial court explained to Chesney, his counsel's requests furthered his right to effective representation. Ollivier, 178 Wn.2d at 838-40. This factor is, therefore, also neutral.

Prejudice

The fourth Barker factor requires the court to consider prejudice the defendant suffered on account of delay. Barker, 407 U.S. at 532. "Prejudice is judged by looking at the effect on the interests protected by the right to a speedy trial: (1) to prevent harsh pretrial incarceration, (2) to minimize the defendant's anxiety and worry, and (3) to limit impairment to the defense." Iniguez, 167 Wn.2d at 295.

Defendants must generally demonstrate "actual" prejudice, and prejudice within the Barker framework is only presumed when delay is extraordinary or the State acted in bad faith. Ollivier, 178 Wn.2d at 840, 842. A delay of 18 months is not extreme. See Ollivier, 178 Wn.2d at 843 (noting delays of 22 months and 45 months not considered to be extreme). We do not presume prejudice.

As here, where prejudice is not presumed, the defendant must make a "particularized" showing of prejudice which may consist of (1) oppressive pretrial confinement, (2) anxiety and concern, and/or (3) possible impairment of the defense due to fading memories and loss of evidence. Ollivier, 178 Wn.2d at 840. A particularized showing is distinct from the "theoretical underpinnings" of presumed prejudice and is required when delay is not the result of bad faith and

15

is not long enough for the presumptive prejudice to arise. Ollivier, 178 Wn.2d at 840.

Chesney provides no authority suggesting that a period of incarceration of 18 months is oppressive, in the absence of uncommon conditions of confinement. See Ollivier, 178 Wn.2d at 844 (noting that courts have not found periods of incarceration of 22 months and longer to be oppressive). And because anxiety and concern are "often experienced" to some extent, prejudice based on these conditions requires an "unusual" showing. Ollivier, 178 Wn.2d at 845. Prejudice stemming from possible impairment to the defense is the most important type of prejudice "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." Barker, 407 U.S. at 532. Where continuances are granted at the request of the defense, any impairment of the defense must be "weighed against the benefits obtained via the continuances." Ollivier, 178 Wn.2d at 845.

Chesney does not explain how the delay affected his defense or point to a loss of exculpatory evidence. Instead, he accuses the State of "bullying" by disclosing "unnecessary" witnesses and withholding critical evidence. But again, the State's identification of some witnesses who did not ultimately testify at trial does not, in of itself, demonstrate bullying or bad faith. And the record indicates that the State continued to provide discovery, ultimately provided a final witness list, was actively working to obtain all video evidence, and that the delay in disclosing some evidence may have been outside of its control due to damage caused by the collisions with Chesney's vehicle. There is nothing in the record to

16

indicate that the delay caused any witnesses to become unavailable or evidence to disappear.[9]  Chesney makes no particularized showing of prejudice stemming from the delay.

On balance, the Barker factors weight against Chesney.  As in Ollivier, continuances were largely the result of defense requests to ensure adequate representation at trial.  Although Chesney objected to the delay and was subject to detention, the delay was not unduly long, and he has not shown any particularized prejudice resulting from the delay.  Accordingly, the court's rulings did not violate Chesney's constitutional right to a speedy trial.

Statement of Additional Grounds

Finally, in a pro se statement of additional grounds for relief, Chesney claims he was deprived of effective assistance of counsel.  In particular, Chesney contends that defense counsel encouraged the jury to find him guilty of theft, even though he maintained his innocence as to all charges.

To establish ineffective assistance of counsel, a defendant must show both deficient performance and resulting prejudice. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). "Deficient performance is that which falls below an objective standard of reasonableness." State v. Weaville, 162 Wn. App. 801, 823, 256 P.3d 426 (2011).  Prejudice is established

---

[9] To the extent that Chesney contends in his statement of additional grounds that the delay prevented him from presenting a witness who was no longer employed by the Department of Corrections at the time of trial, it is unclear why the witness's current employment affected the admissibility or availability of that testimony.  And, more importantly, as explained infra, this claim cannot be raised on direct appeal because it depends on alleged facts outside of the appellate record.

when there is a reasonable probability that the outcome of the proceeding would have been different had counsel's performance not been deficient. State v. McFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

There is a strong presumption of effective assistance and the defendant bears the burden of demonstrating an absence of a strategic basis for the challenged conduct. McFarland, 127 Wn.2d at 335. An attorney's performance is not deficient if it constitutes a legitimate trial strategy or tactic. State v. Grier, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011).

Conceding guilt on a particular count can be a sound trial tactic when the evidence on that count is overwhelming. State v. Silva, 106 Wn. App. 586, 596, 24 P.3d 477 (2001). This approach can secure the jury's confidence and preserve the defendant's credibility when a more serious charge is at stake. State v. Hermann, 138 Wn. App. 596, 605, 158 P.3d 96 (2007); Silva, 106 Wn. App. at 597-98. There is no requirement that defense counsel must consult with the client before making this strategic choice. Silva, 106 Wn. App. at 596 (citing Underwood v. Clark, 939 F.2d 473, 474 (7th Cir. 1991)).

Here, defense counsel made a reasonable tactical decision to concede guilt as to the lesser included misdemeanor charge of theft in the third degree, in light of the evidence. It was a legitimate strategy to gain credibility with the jury when Chesney faced many more serious charges. Chesney does not suggest any defense he might have mounted to theft in the third degree. He cannot demonstrate that the strategy was prejudicial. He avoided a significant risk of conviction on an additional felony charge of theft in the first degree, and the jury

18

acquitted him of four charges and failed to reach a verdict on three charges. Chesney's ineffective assistance claim fails.

Chesney also challenges the trial court's denial of his motion to suppress and the court's finding that police officers advised him of his rights in accordance with Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). But, the testimony of officers at the CrR 3.5 hearing and body-worn video evidence supported the court's finding. To the extent that Chesney raises other claims, the facts allegedly supporting those claims are not contained in the record before the court, and we cannot consider them. See State v. McFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995) ("If a defendant wishes to raise issues on appeal that require evidence or facts not in the existing trial record, the appropriate means of doing so is through a personal restraint petition.").

Affirmed.

_____
Coburn, J.

WE CONCUR:

_____          _____
Andrus, A.C.J.                                           Mann, C.J.

19